## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COMCAST CABLE COMMUNICATIONS, §
LLC, COMCAST OF RICHARDSON, LP; §
COMCAST OF PLANO, LP; §
COMCAST OF DALLAS, LP, §
§
      Plaintiffs, §      C.A. No. 1:06-cv-00407-KAJ
§
vs. §      Jury Trial Demanded
§
USA VIDEO TECHNOLOGY CORP., §
§
      Defendant. §

## USVO'S MEMORANDUM IN SUPPORT OF ITS
## MOTION TO DISMISS, STAY OR TRANSFER

      Defendant USA Video Technology Corporation ("USVO") moves the Court to Dismiss or Stay this action pursuant to the "first to file" rule, or in the alternative, to transfer it to the Eastern District of Texas, Marshall Division pursuant to 28 U.S.C. § 1404(a) (1993).

### I.    INTRODUCTION

      On June 13, 2006, USVO filed a patent infringement case in the Eastern District of Texas against Time Warner Inc. ("Time Warner"), Cox Communications, Inc. ("Cox"), Charter Communications, Inc. ("Charter"), Comcast Cable Communications LLC ("Comcast"), Comcast of Richardson, LP ("Comcast Richardson"), Comcast of Plano LP ("Comcast Plano"), and Comcast of Dallas, LP ("Comcast Dallas") alleging infringement of United States Patent No. 5,130,792 ("the '792 patent") entitled "Store and Forward Video System" in a case captioned *USA Video Technology Corporation v. Time Warner Inc. et al.* No. 2-06CV-239 ("the Texas litigation".) (attached as Exhibit A).   All defendants were mailed a courtesy copy of the

Complaint on this date. On June 19, 2006, Texas defendant Coxcom responded by filing an action in this Court seeking a declaratory judgment of noninfringement, invalidity, and/or unenforceablity of the '792 patent[1], with Texas defendant Time Warner Cable Inc. filing a similar declaratory judgment complaint on June 15, 2006[2], and Texas defendant Comcast filing their equally similar declaratory judgment complaint on June 27, 2006[3]. The Court will note that all of the declaratory judgment actions were filed only *after* USVO had already filed its patent infringement complaint in the Eastern District of Texas.

## II.    STATEMENT OF FACTS

Texas plaintiff USVO is the owner of the '792 patent which is directed to systems that communicate video programs to subscribers upon request, commonly referred to as video-on-demand (VOD). Comcast, like the other defendants in the Texas case, operates digital cable systems in which it provides VOD services to its subscribers by providing digital set-top boxes to enable access to the VOD services. A prior patent infringement action based on the '792 patent was filed by USVO in this Court against Movielink, LLC, in a case captioned *USA Video Technology Corporation v. Movielink, LLC* C.A. No. 03-368-KAJ ("the Movielink litigation"). That patent case involved a different defendant, and indeed an entirely different class of allegedly infringing products. As the Court is aware, the sole product accused of infringing in the Movielink litigation is an interactive website that provides VOD services over the internet. That litigation recently concluded after an appeal to the Federal Circuit to resolve the application by this Court of its claim construction of one particular claim term. Although USVO was unsuccessful in its appeal, the lone issue resolved in Movielink's favor was specific to the

---

[1] *Coxcom, Inc. v. USA Video Technology Corp.,* C.A. No. 1:06-cv-00394-KAJ
[2] *Time Warner Cable, Inc. v. USA Video Technology Corp.,* C.A. No. 1:06-cv-00387-KAJ
[3] *Comcast Cable Communications, LLC et al. v. USA Video Technology Corp.* C.A. No. 1:06-cv-00407-KAJ

implementation of the Movielink system and is not applicable to cable VOD services such as those offered by Comcast and its fellow cable companies.

For the reasons delineated below, this Court should dismiss or stay this action pursuant to the "first to file" rule, or in the alternative, transfer it to the Eastern District of Texas, Marshall Division pursuant to 28 U.S.C. § 1404(a).

### III.    ARGUMENT

#### a.    First-to-File Rule Applies

Determining which action should have priority under the first-to-file rule "raises the issue of national uniformity in patent cases, and invokes the special obligation of the Federal Circuit to avoid creating opportunities for dispositive differences among the regional circuits" and thus this Court should apply Federal Circuit law to this issue. *Genentech, Inc. v. Eli Lilly Co.,* 998 F.2d 931, 937 (Fed. Cir. 1993). In patent cases, "the forum of the first-filed case is favored, unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, require otherwise." Id. The second-filed action may proceed only if there is sound reason that would make it unjust or inefficient to continue the first filed action. Id. at 938. Further, "the rule favoring the right of the first litigant to choose the forum, absent countervailing interests of justice or convenience, is supported equally when there is a mere day between filing as it is when a year intervenes between the suits. Id.

#### b.    First to File Rule Requires Dismissal or a Stay of this Case.

Thus, the first-filed rule is as simple as its name suggests: "where two patent lawsuits involving the same claims are filed in different jurisdictions, the Federal Circuit requires that the first-filed action be given preference absent special circumstances." *Sony Elecs., Inc. v. Orion IP, LLC,* 2006 U.S. Dist. LEXIS 9834 (D. Del. 2006) quoting *Corixa Corp. v. IDEC Pharm. Corp.,*

3

*2002 U.S. Dist. LEXIS 2980, \*304 (D. Del. Feb. 25, 2002).* In the instant matter, there can be no dispute as to which action was filed first or that the two cases are exactly alike, as they involve the same patent, the same parties, and the same technology. When a court is confronted with a declaratory judgment action, the inverse of which (i.e. an infringement action) was filed prior to the declaratory judgment action, the declaratory judgment action must be dismissed. *Id.* at \*3. (stating "[T]he court is confronted with a declaratory judgment action by SCA alone, the inverse of which (i.e. an infringement action) was filed about three months earlier in Texas. Therefore, pursuant to the first-filed rule, SCA must be dismissed from this case.") There are no special considerations in this case, as explained more explicitly below.

A court has the "inherent power to conserve judicial resources by controlling its own docket." *Zoetics, Inc. v. Yahoo!, In., 2006 U.S. dist. LEXIS 46910 (D. Del. 20006) quoting Cost Bros., Inc. v. Travelers Indem. Co.,* 760 F.2d 58, 60 (3rd Cir. 1985). In ruling on a motion to stay, courts are guided by three factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Pegasus Development Corp. v. DirecTV, Inc.* 2003 Dist. LEXIS 8052 at \*3-\*4 quoting *Xerox Corp. v. 3Com Corp.,* 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999). These factors weigh in favor of the first-filing party, USVO. Both litigations are in their early stages, and the presumption that the first-filed rule should apply has not been overcome.

c.    Transfer Under 28 U.S.C. § 1404(a)

The statute governing transfers of venue, namely 28 U.S.C. § 1404(a), states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." In patent cases, a

district court applies the procedural law of the circuit in which it resides.  See *Storage Tech.*

*Corp. v. Cisco Sys. Inc.,* 329 F.3d 823, 836 (Fed. Cir. 2003).  The burden of showing the need for

a transfer is on the movant.  *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3rd Cir. 1995).

In considering a 1404(a) transfer, the Court must balance between several private and

public interests.  *Zoetics, Inc. v. Yahoo!, Inc.,* 2006 U.S. Dist. LEXIS 46910 (D. Del. 2006) citing

*Reyno v. Piper Aircraft Co.,* 630 F.2d 149, 159 (3rd Cir. 1980).  The private interests to be

considered are:  the plaintiff's choice of forum, the defendant's preferred forum, whether the

claim arose elsewhere, the convenience of the witnesses, but only so far as the witnesses might

be unavailable for trial if the trial is conducted in a certain forum, and the location of books and

records, to the extent that these books and records could not be produced in a certain forum.

*Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 883 (3rd Cir. 1995).

The only two relevant private factors, specifically the plaintiff's choice of forum and the

defendant's preferred forum, when balanced, must come out in USVO's favor.  When ruling on a

motion to transfer, this Court must "balance all of the relevant factors and respect that a

plaintiff's choice of forum is entitled to substantial deference and should not be lightly

disturbed." *Zoetics citing Stratos Lightwave, Inc. v. E20 Communications, Inc.,* 2002 U.S. Dist.

LEXIS 5653, at *5 (D. Del Mar. 26, 2002).  Perhaps counter-intuitively, this factor weighs

heavily in favor of defendant USVO in the Delaware case, as it is plaintiff in the first-filed

action.

The public factors to be considered are:  the enforceability of the judgment, practical

considerations regarding the ease, speed, or expense of the trial, the administrative difficulty due

to court congestion, the local interest in deciding local controversies in the home forum, the

public policies of the two fora, and the trial judge's familiarity with the applicable state law in

diversity cases.  Id.  Thus, the public interest aspects also weigh in the favor of transfer, as where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court."  *Cashedge, Inc. v. Yodlee, Inc.* 2006 U.S. Dist. LEXIS 50488, 7-8 (D. Del. 2006) quoting *Brunswick Corp. v. Precor Inc.,* 2000 U.S., Dist. LEXIS 2222 at *8 (D. Del. Dec. 12, 2000).  Several factors that support a decision to transfer are present in this case: namely whether the litigation involves: (1) the same parties, (2) related or similar technologies for the judge to become familiar with, and (3) a common field of prior art.  Id.

The judgment would be enforceable in both jurisdictions, there is not especial administrative difficulty due to court congestion, the public policies of the two fora regarding patents do not differ, and this is not a diversity case requiring application of state laws.  Patent rights are not local or state matters and therefore cannot give rise to a local controversy, or implicate local public policy.  *Stratos Lightwave, Inc. v. E20 Communications, Inc.,* 2002 U.S. Dist. LEXIS 5653, at *8 (D. Del. Mar. 26, 2002).  Although the prior experience of a particular trial judge with a particular patent has been a factor considered in transfer motions when it is assumed that the same trial judge will be called upon to preside over the subsequent trial, in this case there is a distinct possibility that the Court will not preside over the entire trial, and thus the case should be transferred to Texas.  *Ziegler v. Dart Industries, Inc.* 383 F. Supp 362, 365 (D.C. Del. 1974).  As Judge Kent A. Jordan, the judge presiding over the instant action and who presided over the prior Movielink litigation, has recently been nominated to the U.S. Court of Appeals for the Third Circuit, and is expected to be confirmed easily, judicial experience should not be a factor that is considered in the analysis.  (Please see Exhibit B.)  Further, in the prior infringement action based on the '792 patent, determinations of validity and enforceability were not reached, as the Court construed one term which resulted in a holding of non-infringement.

6

Thus, arguments hoping to shackle the District of Delaware with every litigation involving the '792 patent are weak at best.

## IV.    CONCLUSION

For the reasons delineated above, this Court should stay or dismiss this case in favor of the first-filed patent infringement case in the Eastern District of Texas.  Alternatively, this Court should transfer this case under 28 U.S.C. 1404(a) for resolution in the Eastern District.


Date: August 10, 2006

Richard K. Herrmann #405
MORRIS JAMES HITCHENS &
    WILLIAMS, LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19801
(302) 888-6800
rherrmann@morrisjames.com

Attorneys for Defendant
USA Video Technology Corp.


OF COUNSEL:
Edward W. Goldstein
Corby R. Vowell
Alisa A. Lipski
Goldstein,  Faucett & Prebeg, LLP
1177 West Loop South, Suite 400
Houston, Texas  77027
(713) 877-1515 – Telephone
(713) 877-1737    Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of August, 2006, I electronically filed the foregoing document, **USVO'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS, STAY OR TRANSFER,** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Kenneth J. Nachbar
Maryellen Noreika
Morris Nichols Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

Additionally, I hereby certify that the foregoing document was served as indicated on the following:

**VIA EMAIL ON 8/10/2006 AND HAND DELIVERY ON 8/10/2006**
Kenneth J. Nachbar
Maryellen Noreika
Morris Nichols Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

**VIA EMAIL ON 8/10/2006 AND FEDERAL EXPRESS ON 8/11/2006**
Matthew B. Lehr
Suong Nguyen
Duane Nash
Yiping Liao
Davis Polk & Wardwell
1600 El Camino Real
Menlo Park, CA  94025
650.752.2000
matthew.lehr@dpw.com
suong.nguyen@dpw.com
duane.nash@dpw.com
yipping.liao@dpw.com

Richard K. Herrmann (I.D. No. 405)
Morris James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19801
(302) 888-6800
rherrmann@morrisjames.com

Attorneys for Defendant
USA VIDEO TECHNOLOGY CORPORATION

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| USA Video Technology Corporation, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Case No. 2-06CV-239 |
| | § | |
| TIME WARNER INC.; COX | § | |
| COMMUNICATIONS, INC.; CHARTER | § | JURY TRIAL DEMANDED |
| COMMUNICATIONS, INC.; | § | |
| COMCAST CABLE | § | |
| COMMUNICATIONS, LLC; COMCAST | § | |
| OF RICHARDSON, LP; COMCAST OF | § | |
| PLANO, LP; COMCAST OF DALLAS, | | |
| LP | | |
| | | |
| Defendants | | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, USA Video Technology Corporation ("USVO"), files this Original Complaint

against Defendants, Time Warner Inc. ("Time Warner"), Cox Communications, Inc. ("Cox"),

Charter Communications, Inc. ("Charter"), Comcast Cable Communications LLC

("Comcast"), Comcast of Richardson, LP ("Comcast Richardson"), Comcast of Plano, LP ("Comcast

Plano"), and Comcast of Dallas, LP ("Comcast Dallas") and alleges as follows:

### THE PARTIES

1.     USVO is a corporation organized under the laws of the State of Connecticut with its

principal place of business at 83 Halls Road, P.O. Box 245, Old Lyme, Connecticut, 06371.

2.     Time Warner, on information and belief, is a corporation organized under the laws of the

State of New York. Time Warner is doing business in Texas, and, on information and

belief, has a principal place of business at 1 Time Warner Center, New York, NY 10019-8016. Time Warner may be served with process by serving its registered agent, the CT Corporation System, 701 Brazos Street, Suite 360, Austin, TX 78701.

3. Cox, on information and belief, is a corporation organized under the laws of the State of Delaware. Cox is doing business in Texas, and, on information and belief, has a principal place of business at 1400 Lake Hearn Drive, Atlanta, GA 30319. Cox may be served with process by serving its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

4. Charter, on information and belief, is a corporation organized under the laws of the State of Delaware. Charter is doing business in Texas, and, on information and belief, has a principal place of business at 12405 Powerscourt Drive, St. Louis, MO 63131. Charter may be served with process by serving its registered agent, Corporation Service Company DBA CSC-Lawyers Incorporating Service Company, 701 Brazos, Suite 1050, Austin, TX 78701.

5. Comcast, on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast is doing business in Texas, and, on information and belief, has a principal place of business at 1500 Market Street, Philadelphia, PA 19102-2148. Comcast may be served with process by serving its registered agent, Comcast Capital Corporation at 1201 Market Street, Suite 1000, Wilmington, DE 19801.

6. Comcast Richardson on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast Richardson is doing business in Texas, and, on information and belief, has a principal place of business at 1201 Market Street, Suite

2

1405, Wilmington, DE 19801. Comcast Richardson may be served with process by serving its registered agent, CT Corporation System, 350 North St. Paul St., Dallas, TX 75201.

7.    Comcast Plano on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast Plano is doing business in Texas, and, on information and belief, has a principal place of business at 1201 Market Street, Suite 1405, Wilmington, DE 10901. Comcast Plano may be served with process by serving its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201.

8.    Comcast Dallas on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast Dallas is doing business in Texas, and, on information and belief has a principal place of business at 1201 Market Street, Suite 1405, Wilmington, DE 19801. Comcast Dallas may be served with process by serving its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201.

## JURISDICTION & VENUE

9.    This is an action for infringement of a United States patent. Accordingly, this action arises under the patent laws of the United States of America, 35 U.S.C. § 1 et. seq. and jurisdiction is properly based on Title 35 United States Code, particularly § 271, and title 28 United States Code, particularly § 1338(a).

10.    Venue is proper in this court under Title 28 United States Code § 1391(b) and 1400(b).

## PATENT INFRINGEMENT COUNT

11.    On July 14, 1992, United States Patent No. 5,130,792 ("the '792 patent") entitled "Store and Forward Video System" was duly and legally issued. A true and correct copy of the '792

3

patent is attached as Exhibit A. The '792 patent is directed to systems that communicate video programs to subscribers upon request, commonly referred to as video-on-demand (VOD).

12.    Pursuant to 35 U.S.C. § 282, the above-listed United States Patent is presumed valid.

13.    USVO is the owner of the '792 patent.

14.    Time Warner, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Time Warner provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Time Warner has in the past and continues to infringe at least claim 1 of the '792 patent.

15.    Cox, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Cox provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Cox has in the past and continues to infringe at least claim 1 of the '792 patent.

16.    Charter, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Charter provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Charter has in the past and continues to infringe at least claim 1 of the '792 patent.

17.    Comcast, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Comcast provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Comcast has in the past and continues to infringe at least claim 1 of the '792 patent.

4

18.  Comcast Richardson, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Comcast Richardson provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Comcast has in the past and continues to infringe at least claim 1 of the '792 patent.

19.  Comcast Plano, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Comcast Plano provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Comcast has in the past and continues to infringe at least claim 1 of the '792 patent.

20.  Comcast Dallas, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Comcast Dallas provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Comcast has in the past and continues to infringe at least claim 1 of the '792 patent.

21.  The Defendants' infringement of the '792 patent alleged above has injured USVO and thus, it is entitled to recover damages adequate to compensate for the Defendants' infringement, which in no event can be less than a reasonable royalty.

## DEMAND FOR JURY TRIAL

22.  USVO hereby demands a jury trial on all claims and issues triable of right by a jury.

## PRAYER FOR RELIEF

Wherefore, USVO prays for entry of judgment:

5

A.    that Defendants, Time Warner, Cox, Charter, Comcast, Comcast Richardson, Comcast Plano and Comcast Dallas, have infringed one or more claims of the '792 patent;

B.    that Defendants, Time Warner, Cox, Charter, Comcast, Comcast Richardson, Comcast Plano and Comcast Dallas, account for and pay to USVO all damages caused by the infringement of the '792 patent, which by statute can be no less than a reasonable royalty;

C.    that USVO be granted pre-judgment and post-judgment interest on the damages caused to them by reason of Defendants, Time Warner, Cox, Charter, Comcast, Comcast Richardson, Comcast Plano and Comcast Dallas's infringement of the '792 patent;

D.    that USVO be granted its attorneys' fees in this action;

E.    that costs be awarded to USVO;

F.    that USVO be granted such other and further relief as the Court may deem just and proper under the current circumstances.

Respectfully submitted,

Date: 6/12/06 _____        _____

Edward W. Goldstein
Texas Bar. No. 08099500
GOLDSTEIN, FAUCETT & PREBEG, LLP
1177 West Loop South, Suite 400
Houston, TX 77027
Tel: 713/877-1515
Fax: 713/877-1737
E-mail: egoldstein@gfiplaw.com

T. John Ward, Jr.
State Bar No. 00794818
Law Office of T. John Ward, Jr., P.C.
P.O. Box 1231

6

Longview, Texas 75606-1231
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)
E-mail: jw@jwfirm.com
ATTORNEYS FOR PLAINTIFF

Of Counsel:

GOLDSTEIN, FAUCETT & PREBEG, L.L.P
Corby R. Vowell
Texas Bar No. 24031621
1177 West Loop South, Suite 400
Houston, Texas 77027
(713) 877-1515 – Telephone
(713) 877-1737 – Facsimile

# EXHIBIT A

US005130792A

## United States Patent [19]

### Tindell et al.

| | |
|---|---|
| [11] | Patent Number: **5,130,792** |
| [45] | Date of Patent: **Jul. 14, 1992** |

[54] **STORE AND FORWARD VIDEO SYSTEM**

[75] Inventors: Elbert G. Tindell, Dallas; Kyle Crawford, Grand Prarie, both of Tex.

[73] Assignee: USA Video Inc., Dallas, Tex.

[21] Appl. No.: 475,137

[22] Filed: Feb. 1, 1990

[51] Int. Cl.⁵ .................................... H04N 7/14
[52] U.S. Cl. .......................... 358/85; 358/86; 358/102; 358/134; 379/100
[58] Field of Search .......... 358/86, 133, 85, 134, 358/102; 379/53, 100

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,028,733 | 6/1977 | Ulicki | 358/102 X |
| 4,506,387 | 3/1985 | Walter | 455/612 |
| 4,513,390 | 4/1985 | Walter et al. | 358/102 X |
| 4,703,348 | 10/1987 | Yuasa | 358/133 |
| 4,769,833 | 9/1988 | Farleigh et al. | 358/86 X |
| 4,772,956 | 9/1988 | Roche et al. | 358/134 X |
| 4,782,397 | 11/1988 | Kimoto | 358/102 X |
| 4,816,901 | 3/1989 | Music et al. | 358/85 X |
| 4,890,320 | 12/1989 | Monslow | 380/10 |
| 4,890,321 | 12/1989 | Seth-Smith et al. | 358/86 X |
| 4,918,523 | 4/1990 | Simon | 358/133 |
| 4,924,311 | 5/1990 | Ohki et al. | 358/133 X |
| 4,947,244 | 8/1990 | Fenwick | 358/86 |
| 4,949,187 | 8/1990 | Cohen | 358/102 X |
| 4,953,196 | 8/1990 | Ishiwaka et al. | 358/85 X |

*Primary Examiner*—Victor R. Kostak
*Attorney, Agent, or Firm*—Kenneth C. Hill

[57] **ABSTRACT**

A system and method for transferring video programs from a first location to a remote location provides for communication of the programs over selected commercial telephone networks. The program signals are digitized, compressed, and stored at the first location, and transferred to the remote location on request of a viewer. Due to the compression of the program, the time required for electronically transferring the program to the remote location is much less than the viewing time for such program. The compressed program is reconstructed at the remote location for viewing on available video display devices.

**9 Claims, 4 Drawing Sheets**





*Fig. 1*

*Fig. 2*

*Fig. 3*



Fig. 4



Fig. 5



Fig. 6

Fig. 7

5,130,792

**1**

## STORE AND FORWARD VIDEO SYSTEM

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to video systems and more specifically to a system and method for transferring a video program for display at a remote location.

2. Description of the Prior Art

Viewing of various types of video programs has become increasingly popular. These programs are generally viewed on standard television sets. Typical video programs include motion pictures, entertainment produced for television, and educational and training programs. An extremely wide variety of programs have been designed or adapted for television viewing.

In order to transfer the video programs to a remote location where they can be viewed, programs can be broadcast using radio waves, transferred to the remote location by means of a specially installed dedicated cable, or transfer of a physical copy on video tape or video disk can be made. Each method of distributing video programs has drawbacks for certain applications.

When video programs are transferred using radio waves, there is little or no control over who receives and views the program. This method of transferring video programs is not suitable for limited distribution of pay programs. In addition, the number of channels for transferring programs is not unlimited, and picture quality of the program can be degraded by atmospheric conditions.

Barring technical problems, programs transferred to a remote location along a specially installed, dedicated cable generally have a reliably good picture quality. However, the cable must be installed at each remote location, and controlled through a centralized facility. Although many video channels can be carried over some cable systems, the number of channels is, again, not unlimited. As is the case with broadcast systems, transmitting equipment must be made available at the time any particular program is to be viewed. The selection of programs and times for viewing are made centrally, as is the case with broadcast systems, and are not under the control of a viewer at a remote location.

Physical transport of video tapes to a remote location allows the viewer to select the program to be viewed and the time for viewing. However, such tapes must be physically transported to the remote location. This takes time, and is often not convenient for the viewer. In addition, the physical video tape or disk containing the programming is subject to loss, theft, and deterioration.

It would be desirable to provide a system and method for transmitting video programs to remote locations which overcomes various drawbacks as described above.

### SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a system and method for transferring video programs from a first location to a remote location.

It is another object of the present invention to provide such a system and method wherein the programs are electronically transferred in a short period of time relative to the viewing time of the programs.

It is a further object of the present invention to provide such system and method which does not require

**2**

that special, dedicated cables be connected to the remote location.

Therefore, according to the present invention, a system and method for transferring video programs from a first location to a remote location provides for communication of the programs over selected commercial telephone networks. The program signals are digitized, compressed, and stored at the first location, and transferred to the remote location on request of a viewer. Due to the compression of the program, the time required for electronically transferring the program to the remote location is much less than the viewing time for such program. The compressed program is reconstructed at the remote location for viewing on available video display devices.

### BRIEF DESCRIPTION OF THE DRAWINGS

The novel features believed characteristic of the invention are set forth in the appended claims. The invention itself however, as well as a preferred mode of use, and further objects and advantages thereof, will best be understood by reference to the following detailed description of an illustrative embodiment when read in conjunction with the accompanying drawings, wherein:

FIG. 1 is a high level block diagram of a system for transferring video programs to a remote location;

FIG. 2 is a block diagram of a central data facility;

FIG. 3 is a block diagram of a system for digitizing and compressing video programs;

FIG. 4 is a block diagram of a distribution interface for use with the system of FIG. 1;

FIG. 5 is a block diagram of a receiver for use at a remote location;

FIG. 6 is a flowchart describing a method for making video programs available for transfer to a remote location; and

FIG. 7 is a flowchart illustrating a method for requesting, receiving, and displaying video programs at a remote location.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1, a system for transferring video programs to a remote location includes a central data facility 10 connected to a commercial telephone network 12. The central data facility 10 will be described in further detail in connection with the following figures. Telephone network 12 preferably includes optical fiber connections capable of transferring digital data at very high rates. Such optical fiber systems are currently being installed in selected locations in the United States, and are expected to be widely available in the future.

At a remote location, a telephone 14 and receiving unit 16 are connected to the telephone network 12. A video display device 18, such as a television conforming to the NTSC standard, is connected to the receiving unit 16 for displaying video programs which have been transferred from the central data facility 10 to the receiving unit 16. A viewer who wishes to down load a program from the central data facility 10 into his receiving unit 16 calls the central data facility 10 using the normal telephone 14. After the program has been ordered, the user places the telephone 14 on-hook and switches the receiving unit 16 to standby. The central data facility 10 then returns the call and down loads the requested program into the receiving unit 16 for viewing at a time selected by the viewer.

5,130,792

**3**

A keyboard or other input device is preferably provided on the receiving unit 16 for the viewer to identify the requested program. Identifying information for the receiving unit, used for billing and call-back, can be stored in the receiving unit.

A block diagram of the central data facility 10 is shown in FIG. 2. The central data facility 10 includes a central processor 20 connected to one or more mass storage devices 22. Mass storage devices 22 are preferably high density devices such as optical disks. Programs which are to be handled by the central data facility 10 are originally provided from one or several different types of video source 22 as known in the art. The video programs are digitized and compressed in a digitizing processor 26, and transferred to the central processor 20 for retention in mass storage devices 22.

Incoming requests for programs are connected to a request interface 28, which is in turn connected to the central processor 20. Outgoing programs being transmitted to remote receiving units are routed through a distribution interface 30.

In a preferred embodiment, a user connects to the central data facility 10 through the request interface 28 by means of a standard TOUCH-TONE (DTMF) telephone. Once a connection has been made, the viewer can identify himself and request any available program by entering a proper set of codes. The DTMF tones transferred to the request interface 28 are converted to characters and transmitted to the central processor 20. Central processor 20 identifies the caller and determines whether the requested selection is available. Desired information, such as the availability of a selection, any delay which may be incurred prior to down loading the selected program, or an indication of the charges incurred in the transaction, can be returned to the viewer through a request interface 28 by means of DTMF tones or recorded or synthesized spoken messages.

Once a request has been made and acknowledged, central processor 20 selects an available output channel to distribution interface 30, and requests a telephone switching network connection. Since each viewer must identify himself when the request is made, central processor 20 is able to call an authorized number at a known location corresponding to such user. Once the connection is established, the requested program can be transferred from mass storage 22 through the distribution interface 30 to the remote location. Accounting data regarding the transaction is logged by the central processor 20 for administrative purposes.

Referring to FIG. 3, a block diagram of the digitizing and compression processor 26 is shown. Source 24 provides separate video and audio signals to processor 26. The video signal is applied to a sync and blanking stripper circuit 32. The various sync signals and blanking intervals contained in the video signal are necessary only for display of the program, and can be recreated in the receiving unit 16. The output from sync and blanking stripper 32 is connected to a signal separator 34, which breaks the video signal into its various basic elements. The number of separate channels into which the video signal is separated at this point will depend upon system implementation, with signals such as luminance and chromanance being likely candidates for separate handling.

The separated signals are then converted to digital signals in analog to digital converters 36, and stored in a buffer 38. As shown in FIG. 3, three separate video signals are digitized, but one, two, or more than three

**4**

signals may be used. If the video signal is not split into two or more parts, the output of the sync and blanking stripper 32 can be input directly to an analog to digital converter 36.

Since the audio signal is frequency modulated instead of amplitude modulated, it is preferably handled separately from the video signal. The audio signal is demodulated and filtered in filter 40, and digitized in analog to digital converter 42. The audio signal is also stored in buffer 38.

Digital data from buffer 38 is input to a data compression circuit 44. Compressed data is input to an encoder 46, which encrypts the data in order to preserve privacy. From the encoder 46, the digital data representing the program originally provided by the source 24 is transferred to the central processor 20.

Buffer 38 can be a relatively small buffer, which requires that data be extracted therefrom and compressed in data compression circuit 44 as it is being generated by the source 24. In the alternative, buffer 38 can include mass storage capable of holding an entire program. In this event, the compression and encoding of the data can be performed after the entire program has been digitized, if desired.

Referring to FIG. 4, a block diagram of a preferred embodiment for the distribution interface 30 is shown. Central processor 20 is connected to a high speed bus 48, which is in turn connected to several gateways 50. Although two gateways 50 are shown in FIG. 4, the number actually used depends upon details of the system implementation, especially with reference to the data throughput capabilities of the central processor 20 and the gateways 50.

Each gateway 50 is connected to a low speed bus 52. Each low speed bus 52 is preferably a commercially available local area network. A plurality of optical converters 54 are connected to each low speed bus 52. In FIG. 4, only two converters 54 are shown connected to each low speed bus 52, but more are preferably connected in an actual implementation. The number of converters 54 connected each low speed bus 52 depends on the data transfer rate of the converters 54 and data handling capability of the buses 52.

Data transferred to a converter 54 is placed into an internal buffer 56. Control circuitry 58 controls operation of the converter 54 and communicates with the gateway 50 over low speed bus 52. Control circuitry 58 also controls operation of optical drivers 60, 62. Each optical driver 60, 62 transmits the data from buffer 56 via a modulated light signal as known in the art. Each optical driver 60, 62 is connected to an optical coupler 64, which combines the different light signals onto a single optical fiber. In a preferred embodiment, optical drivers 60, 62 generate light having different wavelengths, which is multiplexed onto a single optical fiber by coupler 64. Particular system designs can utilize only a single optical driver 60, or more than the two optical drivers 60, 62 shown in FIG. 4.

The distribution interface 30 shown in FIG. 4 allows a single central processor 20 to drive a relatively large number of converters 54 at one time. Various alternative designs to that shown in FIG. 4 can, of course, be utilized if desired.

FIG. 5 shows a preferred embodiment of receiving unit 16. The receiving unit 16 shown in FIG. 5 is used only as a stand alone receiver, and does not incorporate the automatic program request facilities described in connection with FIG. 1.

5,130,792

5

The incoming optical signals are filtered by wavelength and split in optical splitter 64, and converted to digital electrical signals. In the embodiment shown in FIG. 5, two different wavelengths of light were used to transmit information over the optical fiber connection, so two separate channels of digital information are generated by splitter 64. The number of optical drivers 60, 62 as described in connection with FIG. 4 determines the number of channels into which the incoming data is split by splitter 64.

Each channel of digital data is connected from splitter 64 to a serial to parallel converter 66, which converts the serial data to byte-wide data. As is known in the art, the serial transmission of the program data preferably includes redundant error correcting code (ECC), allowing for correction of errors within the receiving unit 16. Error correction is performed in error correction units 68, and the data is temporarily stored in buffer 70.

Under control of control unit 72, data is removed from buffer 70 and transferred to decoder 74. Decoder 74 decrypts the compressed data, undoing the encryption effects of encoder 46 described in connection with FIG. 3. Decoded data is then transferred through storage interface 76 and stored into mass storage device 78. Mass storage device 78 is preferably an erasable optical disk, or other similar relatively low cost, high density storage medium.

Data is stored onto mass storage device 78 until the entire requested program has been down loaded from the central data facility 10. Due to the removal of unnecessary information, compression of the remaining data, and high speed transfer, this down loading can be accomplished in much less time than is required to view the program in real time. Once transfer has been completed, control unit 72 communicates such fact to user interface 80, which indicates through visual or audible means to a viewer that the down loaded program is now available for viewing. User interface 80 provides basic functions for the viewer, such as setup for down loading a program, play a program, and pause during play of a down loaded program.

Once a viewer selects the play mode, control unit 72 causes the data stored in mass storage device 78 to be transferred through storage interface 76 to a data decompression unit 82. Data decompression unit 82 restores the compressed data to its raw, uncompressed form, and transfers it to buffer 84. Data is extracted from buffer 84 in real time as needed for viewing, and converted to analog form in digital to analog converter 86. The original video and audio signals are then restored in signal reconstruction circuit 88, which restores blanking intervals, sync signals, and the like which were removed in the digitizing and compression processor 26. The output of signal reconstruction circuitry 88 is a composite video signal or a modulated RF signal suitable for input to a standard television set. If desired, the program signal can alternatively be recreated as a digital signal suitable for display on a digital monitor as known in the art.

Referring to FIG. 6, a preferred method for making a video program available for transmission to a remote location is shown. The program is first digitized 90 and compressed 92 as described in connection with FIG. 3. The program is also preferably encoded 94, and stored 96 in a non-volatile mass storage device. If desired, the encoding step 94 may be left out.

6

At this point, the program is compressed and stored in condition to be transferred. The number of programs which can be stored at one time is limited only by the capabilities of the central processor 20, and the storage available in mass storage devices 22. When a request is received for a particular program 98, a check is made to see whether that program is available 100. If the requested program is not available, perhaps because the viewer made a mistake when entering his selection, such fact is indicated to the viewer 102. If the program is available for down loading, that fact is confirmed to the viewer 104 and the central data facility 10 sets up a telephone connection with the remote location 106. Transfer of the program 108 is then performed as described above.

Referring to FIG. 7, a preferred method is shown by which the receiving unit 16 at the remote location receives and displays a requested program. First, a connection is made to the central data facility 110. As described above in connection with FIG. 1 this is preferably done by utilizing a standard TOUCH-TONE (DTMF) telephone handset to dial the central facility and enter a selection.

The viewer then requests the desired program 112, and waits to see if it is available 114. If not, the process is complete. If the requested selection is available, the viewer hangs up the telephone handset and switches the receiving unit 16 to standby. The program is then received by the receiving unit 118, decoded, and stored into mass storage 122. When the viewer is ready to view the program, it is decompressed 124 and played back 126 for viewing on a video display. The viewer may preferably pause display of the program at any time by entering a command at the user interface 80, and may view the program multiple times.

The convenience and usefulness of the system described above depends in large part on the ability to be able to quickly down load a video program to the receiving unit 16. In order to illustrate the convenience of the system described above, an example illustrating the numbers involved will now be described.

A single television channel has a 6 megahertz bandwidth. By stripping unnecessary signals as described above, a video signal can be sampled at a rate of 16 megahertz and retain a good signal quality. Samples having a resolution of 8 bits provide sufficient video fidelity for television purposes. This results in a raw data rate of 16 megabytes per second of video data.

Assuming a desired program, such as a motion picture, to have a length of two hours, 7200 seconds of data must be digitized and stored. At a rate of 16 megabytes per second, this results in 115.2 gigabytes of raw data. As is known in the art, video information is highly redundant, so that large compression factors are obtainable. This means that a total data storage requirement of approximately 2–4 gigabytes is expected to be sufficient for a two hour video program. This is the storage requirement for a single program both in the central data facility 10 and the receiving unit 16. This amount of data is well within the capability of optical disks which are presently becoming available.

Assuming 2.3 gigabytes are required for a compressed program, and that a 50% overhead is required for serial transmission of the program data, for error correcting code, blocking, and the like, 3.45 gigabytes of serial data must be transmitted between the central data facility 10 and the receiving unit 16. At eight bits per byte, this results in 27.6 gigabits to be transferred.

7

5,130,792

8

Optical fiber connections currently planned for installation to residential customers will have a maximum data transfer rate of 144 megabits per second. At this rate, the required 27.6 gigabits can be transferred to the receiving unit 16 in 192 seconds, which is just over three minutes. Thus, approximately three minutes is required to transfer a typical video program to the receiving unit 16.

Note that the numbers described above do not require the use of more than one wavelength of light on a single optical fiber. If it is necessary to increase the sampling rate, or the magnitude of each sample, two or more wavelengths of light can be multiplexed on a single cable as described in connection with FIGS. 4 and 5. This would allow better resolution of the video signal with no increase in transmission time.

If a video camera and compression circuitry is available at a remote location, it is possible to use the system described above to transfer video information between two remote locations. A call to the central data facility can be used to initialize the connection between two remote locations, and the central data facility is no longer involved once the connection is setup. Near real-time video signals obtained at one location are compressed and transferred to the second remote location over the phone lines. Instead of storing the signals onto the mass storage device 78, they are transferred directly to the data decompression circuitry 82 and displayed at the second remote location. Near real-time video communication can be accomplished by providing cameras and compression circuitry at each end of a conversation.

While the invention has been particularly shown and described with reference to a preferred embodiment, it will be understood by those skilled in the art that various changes in form and detail may be made therein without departing from the spirit and scope of the invention.

What is claimed is:

1. A system for transmitting video programs to remote locations over a switched telephone network, comprising:

a central data facility having means for storing digital compressed versions of video programs;

a request interface connected to said central data facility and to the telephone network, wherein said request interface receives requests for video programs made over the telephone network and communicates them to said central data facility;

a distribution interface connected to said central data facility and to the telephone network, wherein said distribution interface initiates connections over the telephone network with remote locations in response to requests received by said request interface, and transmits thereto compressed versions of video programs previously requested through said request interface, such compressed versions being transmitted in less time than is required to view the programs in real time;

a receiver at each remote location for connecting to the telephone network and receiving compressed video programs transmitted from said distribution interface, for storing the received programs, and for subsequently playing the video programs at a real time rate on a video display.

2. The system of claim 1, wherein requests are made to said request interface through preselected sequences of DTMF transmissions made from a telephone transceiver.

3. The system of claim 1, wherein said distribution interface comprises:

a plurality of converters for converting digital video programs to a format suitable for transmission over a telephone line; and

a controller for simultaneously providing data representative of digital compressed video programs to each of said converters, wherein a plurality of the remote receivers can be simultaneously receiving such programs.

4. The system of claim 3, wherein said controller comprises:

a high speed central processor for providing processing and data transfer functions;

at least one gateway connected to said central processor by a high speed communications bus; and

a communications network having a lower data carrying capacity than the high speed communications bus connected to each of said gateways, wherein a plurality of converters are connected to each communications network, and wherein said central processor controls the transfer of data to said converters through said gateways over the high speed communications bus and said communications network.

5. The system of claim 1, further comprising:

means for inputting video programs; and

conversion means connected to said inputting means and to said central data facility for digitizing and compressing video programs read in to said inputting means, and for transmitting such compressed video programs to said central facility for storage and subsequent transmission to remote locations.

6. A method for viewing video programs at a location remote from a central data facility, comprising the steps of:

receiving at the central data facility a request for a selected program over a switched telephone network, such request identifying a preregistered requester;

determining whether the selected program is available;

if the selected program is available, initiating a connection over the telephone network to a remote receiving unit previously associated with the preregistered requester;

transmitting a previously stored compressed version of the selected program over the initiated connection in less time than is required to view the program in real time;

receiving the selected program at the remote receiving unit and storing it on a mass storage device; and

after all of the selected program has been stored on the mass storage device, decompressing the selected program and playing it back in real time on a video display.

7. The method of claim 6, wherein the request received at the central data facility comprises a sequence of tones generated by a DTMF telephone.

8. The method of claim 6 wherein, if the selected program is available, such availability is confirmed during a connection in which such request is made, followed by terminating such connection prior to said step of initiating a connection.

9. A system for transmission of video programs over a switched telephone network, comprising:

9                    5,130,792                    10

a central data facility for storing a plurality of video programs in a digital, compressed format;

means connected to said central data facility for digitizing and compressing video programs, and communicating them to said central data facility for storage;

a request interface connected to the telephone network and to said central data facility for receiving requests for desired video programs over the telephone network, such request being communicated to said request interface by sequences of tones generated by a DTMF telephone in response to a user pressing buttons thereon in selected patterns, such patterns identifying the user and the desired video program, wherein said request communicates to the user a confirmation of availability if a desired video program is available for the communication to the user;

a distribution interface connected to said central data facility and to the telephone network, said distribution interface containing a plurality of converters for converting compressed digital data to a form suitable for transmission over the telephone network, wherein said distribution interface initiates a connection with a receiving unit at a preselected remote location in response to the user's request and transmits the digitized, compressed video program to such remote unit over such connection in less time than is required to view the program in real time;

a plurality of receiving units at a plurality of remote locations, each of said receiving units connected to the telephone network and being capable of completing a connection initiated by said distribution interface and receiving digitized, compressed video programs over such connections, wherein each of said receiving units includes a mass storage subsystem for storing a received video program in compressed format, and a decompression subsystem for reading a stored video program from the mass storage subsystem at the user's convenience and converting it to a decompressed form suitable for display in real time; and

a video display device connected to each receiving unit for displaying the converted video program.

* * * * *

# EXHIBIT   B



President • News • Vice President • History & Tours • First Lady • Mrs. Cheney

YOUR GOVERNMENT   KIDS   ESPAÑOL   CONTACT   PRIVACY POLICY   SITE MAP   SEARCH

**The White House**
PRESIDENT GEORGE W. BUSH

EMAIL UPDATES

SEARCH

Home > News & Policies > Policies in Focus        Email This Page



JUDICIAL NOMINATIONS

**Issues**
- Budget Management
- Education
- Energy
- Health Care
- Homeland Security
- Hurricane Recovery
- Immigration
- Jobs & Economy
- Medicare
- National Security
- Pandemic Flu
- Patriot Act
- Renewal in Iraq
- Social Security
- More Issues »

**News**
- Current News
- Press Briefings
- Proclamations
- Executive Orders
- Radio
- RSS Feeds

**Major Speeches**
- Iraq
- Stem Cell Research
- G-8 Summit
- Press Conference

**Interact**
- Ask the White House
- White House Interactive

**Your Government**
- President's Cabinet
- USA Freedom Corps
- Faith-Based & Community
- OMB
- NSC
- More Offices »

**Appointments**
- Nominations
- Application



**PHOTO ESSAYS**

### Judge Kent A. Jordan
*Nominee to the U.S. Court of Appeals for the Third Circuit*

- Judge Kent A. Jordan of the U.S. District Court for the District of Delaware is a highly respected jurist who is widely praised by lawyers and fellow judges alike for his intellect, integrity and judicial temperament.

  - Judge Jordan has been nominated to the Third Circuit, which hears appeals from the federal district courts of Delaware, New Jersey, Pennsylvania and the Virgin Islands.

  - Judge Jordan is known for his keen intellect and analytical skills, courteous manner, command of the courtroom, and evenhanded approach to the law.

- Judge Jordan has a distinguished record as a practicing attorney in the public and private sectors and as a district court judge.

  - In 2002, Judge Jordan was confirmed to the U.S. District Court for the District of Delaware, where he sits today.

  - From 1997 until 2002, Judge Jordan was General Counsel and Vice President of Corporation Service Company (CSC), where he managed all of the corporation's legal affairs.

  - In 1992, Judge Jordan joined the Wilmington, Delaware firm of Morris James Hitchens & Williams as an associate, becoming a partner in 1994. His practice focused on patent and related disputes in the U.S. District Court for the District of Delaware.

  - Judge Jordan served as an Assistant United States Attorney for the District of Delaware from 1987 to 1992, becoming Chief of the Office's Civil Division in 1991. His clients in civil cases consisted mainly of federal agencies with a broad array of legal disputes, from basic torts to complex federal regulatory and contractual problems. He also prosecuted a variety of criminal cases, involving matters such as drug trafficking, environmental crime, extortion, tax violations, and fraud.

  - Judge Jordan has written and spoken on a number of legal issues, predominantly on intellectual property and patent law.

- Judge Jordan has impeccable academic credentials and professional training.

  - Judge Jordan served as a law clerk to the Honorable James L. Latchum of the United States District Court for the District of Delaware.

  - He attended Brigham Young University and graduated in 1981 with high honors and a B.A. in Economics.

  - Judge Jordan received his J.D. cum laude from the Georgetown University Law Center in 1984.

- Judge Jordan has been an active member of his community in both legal and non-legal capacities.

  - Judge Jordan is a member of the Board of Directors of the Community Legal Aid Society in Wilmington, Delaware, and from 1998 to 2002 was a member of the Delaware Bar Association's Standing Committee on the Provision of Legal

**JUDGE KENT A. JORDAN**



**RELATED LINKS**

June 29, 2006
Press Briefing by Tony Snow

June 28, 2006
Nominations Sent to the Senate

July 30, 2002
Nominations Sent to the Senate

July 25, 2002
Nominations Sent to the Senate

July 25, 2002
Nominations to Federal Judiciary

«Back to Nominees



Services to Low Income People.

- Judge Jordan is active in a variety of non-legal organizations, including his church and local civic organizations, and has regularly volunteered at a local group home for the disabled.

- During 1977 to 1978, Judge Jordan served in Japan as a full missionary with the Church of Jesus Christ of Latter-Day Saints.

📧 Email This Page

President | Vice President | First Lady | Mrs. Cheney | News & Policies |
History & Tours | Kids | Your Government | Appointments | Jobs | Contact | Text only

Accessibility | Search | Privacy Policy | Help

# EXHIBIT C

1 of 100 DOCUMENTS

**SONY ELECTRONICS, INC., SONY COMPUTER ENTERTAINMENT AMERICA, INC., SONY PICTURES ENTERTAINMENT, INC., SONY CONNECT, INC., SONY ONLINE ENTERTAINMENT, INC., SONY CORPORATION OF AMERICA, SONY BMG MUSIC ENTERTAINMENT, INC., SONY ERICSSON MOBILE COMMUNICATIONS (USA), INC., Plaintiffs, v. ORION IP, LLC, Defendant.**

**C.A. No. 05-255 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 9834*

**March 14, 2006, Decided**

**COUNSEL:** [*1] For Sony Electronics Inc, Sony Computer Entertainment America Inc., Sony Pictures Entertainment, Inc., Sony Connect Inc., Sony Online Entertainment Inc., Sony Corporation of America, Sony BMG Music Entertainment Inc., Sony Ericsson Mobile Communications (USA) Inc., Plaintiffs: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Orion IP LLC, Defendant: Donald E. Reid, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM

On November 23, 2004, Orion IP, LLC ("Orion"), a Delaware corporation headquartered in Texas, filed a patent infringement suit in the United States District Court for the Eastern District of Texas against fifteen individual defendants, none of whom are parties to this action. However, on February 10, 2005, Orion amended its complaint to add additional parties, including Sony Corporation of America ("SCA"). On April 7, 2005, SCA responded by filing an answer in the Texas action asserting the affirmative defenses of non-infringement and invalidity as to both patents in suit. Then, on May 2, 2005, SCA and seven other so-called non-SCA plaintiffs filed [*2] an action in this court seeking a declaratory judgment of non-infringement and invalidity with respect to the same patents as those asserted against SCA in the Texas action. However, although the patents at issue are

the same, the potentially-infringing products of the non-SCA plaintiffs -- their websites -- are allegedly different than the accused SCA website. Presently before the court is Orion's motion to either dismiss or stay this case under the first-filed rule, or alternatively, to transfer it to the Eastern District of Texas pursuant to *28 U.S.C.A. § 1404(a) (1993)*. (D.I. 11.)

Generally speaking, the first-filed rule is as simple as its name suggests: "where two patent lawsuits involving the same claims are filed in different jurisdictions, the Federal Circuit requires that the first-filed action be given preference absent special circumstances." *Corixa Corp. v. IDEC Pharm. Corp., 2002 U.S. Dist. LEXIS 2980, *304, No. 01-615-GMS, 2002 WL 265094, at *1 (D. Del. Feb. 25, 2002)*. The present case presents a small complication, however, because only one of the plaintiffs in this action is a defendant in the Texas action. But, that complication is not too difficult to overcome [*3] because "Civil Procedure *Rule 21* permits any claim against a party to be severed and proceeded with separately." *Triangle Conduit & Cable Co. v. Nat'l Elec. Prods. Corp., 125 F.2d 1008, 1009 (3d Cir. 1942)*. Moreover, "*Rule 21* permits a court to sever claims *sua sponte.*" *United States v. AMTRAK, No. 86-1094, 2004 U.S. Dist. LEXIS 10867, at *21 (E.D. Pa. June 15, 2004)*. That being the case, and there being no discernable prejudice in severing SCA's claims against Orion, the court will exercise its power to do so. As a result, the court is confronted with a declaratory judgment action by SCA alone, the inverse of which (i.e., an infringement action) was filed about three months earlier in Texas. Therefore, pursuant to the first-filed rule, SCA must be dismissed from this case. *Cf. Triangle Conduit, 125 F.2d at 1009* (holding that this district was under a duty to enjoin a patent-holding defendant in a declara-

tor/judgment action from pursuing an infringement action in another district against the declaratory judgment plaintiff, even though the infringement action in the other district would proceed against other parties in the absence of [*4] the declaratory judgment plaintiff).

With SCA out of the case, the court must still decide the fate of the non-SCA plaintiffs. Orion first argues that, like SCA itself, the non-SCA plaintiffs are subject to the first-filed rule under the holding of *Corixa*, where this court granted a motion to transfer a patent infringement action, based on the first-filed rule, to a district where a previous declaratory judgment action had been filed, even though one of the plaintiffs in the patent infringement action was not a defendant in the declaratory judgment action. *2002 U.S. Dist. LEXIS 2980, 2002 WL 265094, at *1-*2.* However, that plaintiff was a licensee of a defendant in the declaratory judgment action, and could therefore request permission to join that action after the transfer. *2002 U.S. Dist. LEXIS 2980, [WL] at *2.* In this case, the non-SCA plaintiffs cannot be licensees of SCA because SCA is not the patentee. Moreover, the "accused products" in this action are the websites of the non-SCA plaintiffs, which are allegedly different than the SCA website accused in the Texas action. Thus, *Corixa* is distinguishable, and the first-filed rule does not apply to the non-SCA plaintiffs.

Orion's next argument is that the action [*5] should be transferred pursuant to *§ 1404(a)*. In *Jumara v. State Farm Insurance Co.,* the Third Circuit outlined six private interests and six public interests relevant to such a transfer. The private interests are:

(1) The plaintiff's forum preference as manifested in the original choice;

(2) The defendant's preference;

(3) Whether the claim arose elsewhere;

(4) The convenience of the parties as indicated by their relative physical and financial condition;

(5) The convenience of the witnesses -- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and

(6) The location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

*55 F.3d 873, 879 (3d Cir. 1995).* Aside from Orion's preference for Texas and the non-SCA plaintiffs' preferences for Delaware, none of the other private interests are particularly relevant. Orion disagrees, and argues that convenience weighs in favor of transfer. Although Texas may indeed be more convenient for Orion, all of the non-SCA plaintiffs (and Orion) are incorporated in Delaware - a fact that [*6] certainly weighs against transfer. At best, then, the private interests are a wash.

The public interests outlined in *Jumara* include:

(1) The enforceability of the judgment;

(2) Practical considerations that could make the trial easy, expeditious, or inexpensive;

(3) The relative administrative difficulty in the two fora resulting from court congestion;

(4) The local interest in deciding local controversies at home;

(5) The public policies of the fora; and

(6) The familiarity of the trial judge with the applicable state law in diversity cases.

*Id. at 879-80.* Here, Orion argues that although it and the remaining plaintiffs are all Delaware corporations, the local interest favors Texas because Orion has offices in that state. In *Corixa,* three parties were Delaware corporations, and yet, that fact did not weigh against transferring the case to California because the "patents dealt with the treatment of lymphoma, . . . . [which] has far-reaching implications [beyond Delaware's borders]." *2002 U.S. Dist. LEXIS 2980 at *12, 2002 WL 265094, at *4.* By the same token, the fact that Orion has offices in Texas does not weigh in favor of transfer [*7] where the patents deal with technology used in internationally-accessible websites. Orion also argues that because litigation involving the same patents is already underway in Texas, judicial resources will be saved granting a transfer. Although there may be some efficiency to be gained by consolidating certain aspects of discovery, Orion ignores the possibility that collateral issues specific to any one of the many unrelated parties involved in both cases may create inefficiencies that would not arise if the proceedings remained separate. *See Codex Corp. v. Milgo Elec. Corp., 553 F.2d 735, 739 (1st Cir. 1977)* ("Nor are

2006 U.S. Dist. LEXIS 9834, *

we fully convinced of the propriety of using another customer suit of another manufacturer, which, incidentally, may have very different collateral issues, as a magnet to draw a suit to a jurisdiction where it otherwise should not be."). Moreover, simply because Orion initiated an action in Texas involving one set of parties, it should not be able to "bootstrap itself into staying there" when subsequent litigation arises involving a different set of parties. *Id.*

In short, the *Jumara* interests do not weigh in favor of transfer, and therefore, [*8] Orion's motion must be denied as to the non-SCA plaintiffs.

Dated: March 14, 2006

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

IT IS HEREBY ORDERED THAT:

1. Orion's motion to dismiss (D.I. 11) be GRANTED in part and DENIED in part; and

2. The claims of SCA against Orion be SEVERED and DISMISSED.

Dated: March 14, 2006

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT D

1 of 100 DOCUMENTS

**CORIXA CORPORATION, a Delaware corporation, et al., Plaintiffs, v. IDEC PHARMACEUTICALS CORPORATION, a Delaware corporation, Defendant.**

**C.A. No. 01-615 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 2980*

**February 25, 2002, Decided**

**DISPOSITION:** [*1] Defendant's motion to transfer action to Southern District of California GRANTED, Matter TRANSFERRED.

**COUNSEL:** For CORIXA CORPORATION, COULTER PHARMACEUTICAL INC., SMITHKLINE BEECHAM CORPORATION, plaintiffs: Thomas C. Grimm, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For IDEC PHARMACEUTICALS CORPORATION, defendant: Philip A. Rovner, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory Moneta Sleet

**OPINION:**

MEMORANDUM AND ORDER

I. INTRODUCTION

On September 10, 2001, IDEC Pharmaceutical Corporation ("IDEC") filed a complaint in the Southern District of California against Coulter Pharmaceutical Inc. ("Coulter"), Corixa Corporation ("Corixa"), and the Regents of the University of Michigan ("Michigan"). In its complaint, IDEC seeks a declaratory judgment of non-infringement and/or invalidity of five patents. On September 11, 2001, the Oncologic Drugs Advisory Committee ("ODAC") indicated that it would recommend a limited FDA approval of IDEC's drug Zevalin. On September 12, 2001, at approximately 8:33 A.M. PST, IDEC [*2] filed a first amended complaint which included a sixth patent.

On September 12, 2001, at 12:07 P.M. EST, Corixa, Coulter, and GlaxoSmithKline (GSK) (collectively "Corixa") filed the above-captioned action against IDEC. n1 Corixa alleges that IDEC is infringing U.S. Patent Nos. 6,015,542, ("the 542 patent"), 6,090,365 ("the 365 patent"), and 5,595,721 ("the 721 patent"). These patents are three of the patents involved in the California declaratory judgment action.

n1 On September 28, 2001, Michigan was added as a plaintiff in this action.

Presently before the court is IDEC's motion to stay the proceedings, or alternatively, to dismiss or transfer this action to the Southern District of California. n2 For the reasons that follow, the court will grant IDEC's motion to transfer.

n2 IDEC sought to stay the proceedings pending a ruling from the California court on a motion to dismiss. On January 30, 2002, the California court denied the motion to dismiss. IDEC's current motion to stay is therefore moot.

[*3]

II. BACKGROUND

IDEC is a Delaware corporation with its sole place of business in the San Diego area. Coulter is a Delaware corporation with its principle place of business in the San Francisco Bay area. Corixa is a Delaware corporation based in Seattle, Washington. GSK is a Pennsylvania corporation with its principle place of business in Philadelphia, Pennsylvania. The University of Michigan is a constitutional corporation of the State of Michigan, located in Ann Arbor, Michigan.

The patents at issue involve technology for the treatment of lymphoma using targeted radioimmunotherapy. Coulter and Michigan are co-owners of the 542, 365, and 721 patents. Corixa and GSK are the licensees of these patents. Both IDEC and Corixa are currently seeking FDA approval for a commercial embodiment of their respective inventions for the treatment of lymphoma using radioimmunotherapy.

With these facts in mind, the court will now turn to the motion presently before it.

III. DISCUSSION

A. The "First-Filed" Rule

Where two patent lawsuits involving the same claims are filed in different jurisdictions, the Federal Circuit requires that the first-filed action be given preference [*4] absent special circumstances. *See Genentech v. Eli Lilly & Co., 998 F.2d 931, 937 (Fed. Cir. 1993).* The first-filed doctrine also serves to prevent a multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising from common matters. *See id. at 937.* This doctrine applies equally well where the first-filed action is one for a declaratory judgment. *See id. at 938* (noting that, where the declaratory action can resolve the various issues, a first-filed declaratory action is entitled to precedence as against a later-filed patent infringement action.)

Applying the first-filed rule, IDEC argues that the present case should be transferred to the Southern District of California. Notwithstanding that the cases at issue are "mirror image" cases where the court is asked to construe the same patents, Corixa argues that the first-filed rule is inapplicable to the present situation.

Corixa first argues that GSK has not been joined in the California litigation. The record before the court indicates that GSK is Coulter's licensee. It is unclear whether GSK is an exclusive licensee. However, even were the court to accept [*5] Corixa's argument that GSK is an exclusive licensee, that alone does not indicate that GSK is a necessary party to this litigation. Corixa concedes that GSK is a licensee with fewer than all substantial rights. As such, GSK, while likely a proper party to the California lawsuit, is not a necessary party. *See Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1348 (Fed. Cir. 2001)* (holding that an exclusive licensee possessing fewer than all substantial rights may not sue in its own name without joinder of the patent owner.) Finally, to the extent that the parties believe that GSK is a necessary party, GSK may request permission to join the California litigation. n3

n3 Corixa expresses concern over whether the California court has subject-matter jurisdiction over an action between IDEC and GSK. As it is not the court's province to determine another court's subject matter jurisdiction, the court expresses no opinion on this.

Corixa next argues that the [*6] first-filed rule is inapplicable to the present situation because IDEC improperly "raced to the courthouse" in order to file its motion in California. In support of this contention, Corixa points out that its right to file an infringement suit against IDEC did not ripen until after ODAC recommended that the FDA approve Zevalin. However, before ODAC publicly recommended approval, but after IDEC had reason to believe they would do so, IDEC "raced" to file its declaratory judgment action.

The court acknowledges that IDEC's filing seems providential since ODAC's recommendation became public the day after IDEC filed its suit. In its November 6, 2001 Order, however, the California court specifically found that IDEC possessed a reasonable apprehension of suit when it filed its declaratory judgment action. The California court continued by stating that, "an actual controversy existed when IDEC filed the complaint under consideration. Consequently the court finds that IDEC's filing suit was not motivated by "forum shopping alone," but rather was a legitimate exercise of its opportunity under the Declaratory Judgement Act . . . ." This court sees no reason to disagree with the California court's [*7] findings.

Given the information presently before it, the court concludes that having two separate trials in mirror image cases would defeat the purposes of the first-filed rule, namely, sound judicial administration and comity among federal courts of equal rank. *See EEOC v University of Pennsylvania, 850 F.2d 969, 971 (3d Cir. 1988).* Accordingly, the court finds that the application of the rule weighs heavily in favor of transferring this case to the Southern District of California.

B. Section 1404(a)

Transfer to the Southern District of California is also mandated under a section 1404(a) analysis. Section 1404(a) provides that "for the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." *28 U.S.C. § 1404*(a). There is no dispute that this action could have been filed in the Southern District of California. The court will, therefore, move on with inquiry as directed by the Third Circuit. *See Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995).*

In *Jumara*, the Third Circuit provided [*8] a list of factors to assist the district courts in determining "whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors include six private and five public interests which the court may consider. *See id.*

### 1. The Private Interests

The private interests most relevant to this case include: (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent that these files cannot be produced in the alternate forum. n4

n4 For the reasons the court discussed in a previous opinion, it will not afford any weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp. 2d 192, 197-201 (D. Del. 1998).* In not affording weight to these factors, the court avoids the risk of double-counting these interests and thereby throwing off the transfer analysis. *See id.* Instead, the court will consider whether the Southern District of California is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See 28 U.S.C. § 1404(a).*

[*9]

### a. The Convenience of the Parties

Geographically, California is not more inconvenient for the parties than Delaware. Michigan must travel whether the suit is in California or Delaware. GSK is one of the world's largest pharmaceutical companies, and cannot complain about location. The remainder of the parties are based on the West Coast. Furthermore, transfer to California would reduce the overall inconvenience to all parties involved. The parties must already be prepared to litigate the related case currently pending in the Southern District of California. Bringing witnesses and relevant documents to only one location, here California, minimizes the level of disruption caused to all parties by the litigation. This is certainly a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time. Thus, this factor weighs in favor of transfer.

### b. The Convenience of Witnesses

Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed obligated, to procure the attendance of its [*10] own employees for trial. *See Affymeytrix, 28 F. Supp. 2d at 203.* Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are "usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any." *See id.* (internal citations omitted). Fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id.*

There is no evidence on the record that would indicate that Delaware would be an inconvenient forum for potential non-party witnesses. However, the court notes that all the material witnesses in this dispute, party or otherwise, will be in California already to litigate the related matter now pending in the Southern District of California. Requiring that they come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice. However, as there is no clear evidence [*11] that a non-party witness will be unable to attend trial in Delaware, this factor must weigh against transfer.

### c. The Location of Records and Other Documents

The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id. at 205.* There is no indication that either party would be unable to produce the relevant records and documents in Delaware. Thus, because this factor is relevant only insofar as the documents would be unavailable in one forum, the court finds that this factor must weigh against transfer.

From a practical standpoint, however, the court notes that any relevant documents will already be in California for the litigation of that case. The court sees no need to require that the parties move the same documents across the country. Rather, it would be much more efficient to litigate these related actions in one location. However, these considerations are more relevant to the first factor discussed *supra*.

### 2. The Public Factors

As other courts have noted, depending on the circumstances of the case, some of the "public interest" factors listed in *Jumara* may play no role [*12] in the "balance of convenience." *See id. at 205.* The court thus

2002 U.S. Dist. LEXIS 2980, *

elects to discuss only the factors most relevant to the pending case.

a. Practical Considerations Making Trial Easy, Expeditious or Inexpensive

This factor appears to substantially repeat the "first-filed" analysis advanced by IDEC, and accepted by the court, in Section III.A, *supra*. As such, the court declines to further address this issue here, since it has already taken this argument into consideration.

b. Delaware's Interest in this Controversy

Three of the parties in this action are Delaware corporations. However, while the court is mindful of Delaware's interest, that alone will not tip the "balance of convenience" in its favor. This is so because the court can hardly describe the patents as a local controversy unique to Delaware. *See Affymetrix, 28 F. Supp. 2d at 207.* Instead, the patents deal with the treatment of lymphoma. This clearly has far-reaching implications. Accordingly, this factor does not weigh against transferring this case to California.

c. Collective Travel Time and Cost

A mirror image action is currently pending in California. Thus, to require the parties [*13] to simultaneously litigate virtually the same case on different coasts would certainly increase the collective travel time and cost. Thus, this factor weighs in favor of transfer.

IV. CONCLUSION

The court concludes that the "balance of convenience" tips strongly in favor of transferring this action to the Southern District of California.

For these reasons, IT IS HEREBY ORDERED that:

1. IDEC's alternative motion to transfer this action to the Southern District of California (D.I. 8) is GRANTED.

2. The above-captioned matter is hereby TRANSFERRED to the United States District Court for the Southern District of California.

Dated: February 25, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT E

1 of 100 DOCUMENTS

**ZOETICS, INC. and ZOEMAIL, LLC, Plaintiffs, v. YAHOO!, INC., Defendant.**

**Civil Action No. 06-108-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 46910*

**July 6, 2006, Decided**

**COUNSEL:** [*1] Josy W. Ingersoll, Esquire, Karen L. Pascale, Esquire, and Elena C. Norman, Esquire of YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware. Of Counsel: Paul K. Vickrey, Esquire, Douglas M. Hall, Esquire, and Frederick: C. Laney, Esquire, of NIRO, SCAVONE, HALLER & NIRO, Chicago, Illinois, for Plaintiff.

Mary B. Graham, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware. Of Counsel: Michael A. Jacobs, Esquire, of MORRISON & FOERSTER LLP, San Francisco, California. Matthew M. D'Amore, Esquire, and Kyle W.K. Mooney, Esquire, of MORRISON & FOERSTER LLP, New York, New York, for Defendants.

For Zoemail LLC, Plaintiff: Karen L. Pascale, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE.

**JUDGES:** Joseph J. Farnan Jr., District Judge.

**OPINIONBY:** Joseph J. Farnan Jr.

**OPINION:**

### MEMORANDUM OPINION

July 6, 2006
Wilmington, Delaware

Joseph J. Farnan Jr.
**Farnan, District Judge**

Pending before the Court is Defendant's Motion To Stay Action And Transfer Action To The Southern District Of New York. (D.I. 10.) For the reasons set forth below, the Court will deny the Motion.

### BACKGROUND

Plaintiffs ZoEmail, a Delaware limited liability company, and [*2] Zoetics, a New York corporation, filed this action seeking damages, attorneys' fees, and injunctive relief from Defendant, a Delaware corporation, for its alleged infringement of two patents Plaintiffs recently purchased from AT&T, Inc. (D.I. 1.) On October 20, 2004, sixteen months before filing its Complaint, Zoetics filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York. According to Defendant, Zoetics' resort to bankruptcy was spurred at least partially by its inability to pay AT&T for the patents it purchased. (D.I. 11 at 5.) In Bankruptcy Court, Zoetics announced its intention to emerge from bankruptcy by "realizing value from its Intellectual Property" by first "seeking a license with certain significant parties which have infringed upon its intellectual property" and thereafter retaining counsel to sue for infringement. (D.I. 13, Ex. 8 at 2-3.) According to Defendant, it is one of the "significant parties" to which Zoetics was referring. (D.I. 11 at 7.)

AT&T has filed a secured claim against Zoetics in Bankruptcy Court based on a purported security interest it retained in the Patents-in-Suit. Plaintiffs dispute the validity [*3] of AT&T's secured claim. (D.I. 16 at 4-5.) Meanwhile, the Bankruptcy Court has granted Zoetics leave to retain counsel to pursue its intellectual property claims. (D.I. 13, Ex. 10 at 4.)

### DISCUSSION

#### I. Motion to Stay Action

Defendant contends that the Court should stay this action until the ownership of the Patents-in-Suit is resolved in the New York Bankruptcy Court because it will simplify the issues before this Court, it will not unduly prejudice Plaintiffs, and this proceeding is still at an early stage. Plaintiffs respond that no litigation regarding the ownership of the Patents-in-Suit is pending in the New York Bankruptcy Court, and that they would be prejudiced by a stay at this time. Because there is no indication that the issue of patent ownership will be imminently resolved in the Bankruptcy Court and because

granting a stay will prejudice Plaintiffs, the Court will deny Defendant's Motion to Stay.

A. Legal Standard

A Court has the "inherent power to conserve judicial resources by controlling its own docket," *Cost Bros., Inc. v. Travelers Indem. Co., 760 F.2d 58, 60 (3d Cir. 1985)*, and the decision to stay a case is firmly within [*4] the discretion of the Court. Pegasus Development Corp. v. DirecTV, Inc., 2003 U.S. Dist. LEXIS 8052, at *3 (D. Del. May 14, 2003). In ruling on a motion to stay, courts are guided by three factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." 2003 U.S. Dist. LEXIS 8052, at *3-4 (quoting *Xerox Corp. v. 3Com Corp., 69 F. Supp.2d 404, 406 (W.D.N.Y. 1999))*f.

B. Analysis

Defendant is arguing for a stay pending a decision regarding ownership of the Patents-in-Suit by the Bankruptcy Court. Defendant bases its argument on a claim filed by AT&T, an alleged secured creditor of Zoetics. Leaving aside the fact that Plaintiffs dispute the validity of the secured claim (D.I. 16 at 4-5), Defendant has not pointed to any precedent granting a stay under such circumstances. Furthermore, there is nothing to indicate when the Bankruptcy Court will take up the issue of ownership, or even if it plans to do so at all. In fact, the Bankruptcy Court has allowed Zoetics [*5] to retain special intellectual property counsel to "prosecut[e] enforcement actions regarding the Intellectual Property Rights" (D.I. 13, Ex. 9 at 2), though Zoetics ultimately made plain its intention to recover on its intellectual property as part of its emergence strategy. (D.I. 13, Ex. 8 at 2.)

Defendant contends that granting a stay in this case will advance the objective of judicial economy (D.I. 11 at 10) without prejudicing Plaintiffs. ( Id. at 12.) The Court disagrees. Staying the action pending a non-parallel proceeding in which the issue in question may be addressed n1 leaves too much uncertainty to substantially advance judicial economy. The Bankruptcy Court has not evidenced an intention to take up the patent ownership issue; rather, it permitted Zoetics to retain patent counsel in order to pursue its claims.

n1 Defendant repeatedly insists that the issue of patent ownership will be addressed by the Bankruptcy Court (D.I. 20 at 3) but can offer no support for that assertion except to say that Zoetics defaulted on its payment to AT&T and the latter has filed a secured claim in the Bankruptcy Proceeding. (Id.) All of the case law Defendant cites, on the other hand, involves pending proceedings that are either parallel, *Summa Four, 994 F.Supp. 575 at 581*, or directly related to the issue in dispute. *Landis v. N. Am. Co., 299 U.S. 248, 57 S. Ct. 163, 81 L. Ed. 153 (1966)*; *Commissariat a L'Energie Atomique v. Dell Computer Corp., 2004 U.S. Dist. LEXIS 9107, 2004 WL 1554382 (D. Del. May 13, 2004)*.

[*6]

A secured claim in a bankruptcy proceeding, furthermore, is not tantamount to a challenge to Zoetics' patent ownership. Zoetics has announced its intention to sue on its patents to emerge from bankruptcy (D.I. 13, Ex. 8 at 2), and the Bankruptcy Court has not objected. It is therefore conceivable that, even if AT&T has a genuine secured claim, Zoetics could win a patent infringement suit, pay AT&T from the proceeds, and retain the patents. Granting a stay pending the resolution of the bankruptcy proceedings would prejudice Zoetics by preventing it from carrying its reorganization plan to completion in a timely fashion.

The Court concludes that granting a stay would not simplify the issues in this case with such certainty as to substantially advance judicial economy, and that it would prejudice and disadvantage Plaintiffs. Because neither of these factors weighs in favor of granting a stay, the Court is not persuaded that a stay is warranted because the case is still at an early stage. Accordingly, the Court will deny Defendant's Motion to Stay Action.

## II. Motion to Transfer Action

Defendant argues that substantial practical considerations, as well as other private and [*7] public factors, strongly favor transferring the action to the Southern District of New York. Plaintiffs contend that Defendant has not met its burden of clearly showing that transfer is appropriate. Because the Court agrees with Plaintiffs that the factors do not weigh heavily in favor of transfer, it will deny Defendant's Motion to Transfer.

A. Standard of Law

*28 U.S.C. § 1404 (a)* permits a court to transfer a case to any other district where it might have been brought n2 "for the convenience of parties and witnesses" or "in the interest of justice." The purpose of the statute is to "prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack, 316 U.S. 612, 616, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964)*. In considering a *§ 1404 (a)* transfer, the Court must balance a number of private and public

interests. *Reyno v. Piper Aircraft Co., 630 F.2d 149, 159 (3d Cir. 1980).* The relevant private interests are:

> (1) the plaintiff's choice of forum, (2) the defendant's preferred forum, (3) whether the claim arose elsewhere, (4) the convenience of the [*8] expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (5) the location of books and records, to the extent that these books and records could not be produced in a certain forum.

*Jumara v. State Farm Ins. Co., 55 F.3d 873, 883 (3d Cir. 1995).* The relevant public interests are:

> (1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of the trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases.

*Id.* When ruling on a motion to transfer, a court must "balance all of the relevant factors and respect that a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed." *Stratos Lightwave, Inc. v. E20 Communications, Inc., 2002 U.S. Dist. LEXIS 5653,* at *5 (D. Del. Mar. 26, 2002). The moving party has the burden to establish that "the balance of interests [*9] strongly weighs in favor of the transfer," and the transfer will be denied if the factors balance evenly or weigh only slightly in favor. *Id.*

> n2 It is undisputed that this action could have been brought in the Southern District of New York. (D.I. 11 at 13.)

B. Practical Considerations

Defendant first contends that the public interests of practical considerations and judicial efficiency strongly favor transfer because the District Court for the Southern District of New York will be "better positioned to manage the case if and when it is appropriate to proceed." (D.I. 11 at 15.) Defendant also argues that judicial effi-

ciency militates for transfer because Defendant may have to ask the Bankruptcy Court to lift the automatic litigation stay to allow it to pursue counterclaims or file for reexamination of the Patents-in-Suit, a decision that would be reviewed by the District Court for the Southern District of New York. (Id. at 15-16.) Finally, Defendant argues that the transferee court would be better [*10] positioned to adjudicate any standing disputes with regard to ownership of the patents, since it would have already heard any related appeals from the Bankruptcy Court. (Id. at 16.)

The Court concludes that these considerations do not weigh strongly in favor of transfer. As an initial matter, many of Defendant's arguments rely on the proposition that the issue of patent ownership will be imminently resolved by the Bankruptcy Court, which the Court concluded, supra, is not the case. Moreover, while this Court has previously transferred an action to a district where a Chapter 11 case was pending, it did so in large part because the case depended on the interpretation of orders already issued by the transferee judge, and because the case involved administrative claims inextricably intertwined with the bankruptcy proceeding. Bank of America, N.A. v. US Airways, Inc., 2005 U.S. Dist. LEXIS 34902, at *8-9 (D. Del. Dec. 21, 2005).

In this case, there are no existing rulings by Defendant's proposed transferee court that are necessary to resolve the issues. Nor are the details of Zoetics' reorganization plan currently relevant, since the plan has not been filed yet. [*11] (See D.I. 11 at 12.) Ownership of the patents-in-suit has not been challenged in the New York courts, and there is no parallel litigation already in progress. Most importantly, the bankruptcy proceeding is before the Bankruptcy Court, not the District Court, and were a transfer to be granted, the patent infringement case would not be heard by the judge who will be overseeing Zoetics' Chapter 11 case. Defendant attempts to avoid this problem by insisting that judicial efficiency would be advanced because the District Court "would have already heard any related appeals" (Id. at 16), but such speculation does not weigh strongly in favor of transfer. Defendant's argument that Defendant will need to petition the Bankruptcy Court to lift or modify the automatic litigation stay in order to file counterclaims or auxiliary claims runs into the same problem, and the argument that the District Court in the Southern District of New York would hear those appeals is again unpersuasive.

While it may have been marginally more expedient for this case to have been brought in the Southern District of New York, the considerations presented by Defendant do not militate in favor of transfer so [*12] as to outweigh Plaintiffs' choice of forum. Simply put, the Court can find no compelling reason why the District of

Delaware is not an appropriate venue to resolve the issue of patent ownership. In fact, a resolution of the ownership dispute in this Court could as easily assist the Bankruptcy Court in carrying out its function.

C. Convenience and Availability of Non-Party Witnesses

Defendant argues that the convenience of non-party witnesses weighs strongly in favor of transfer. "Convenience of the expected trial witnesses is the most important factor to consider when determining whether or not transfer is appropriate." Memminger v. Infocure Corp., 2000 U.S. Dist. LEXIS 22077 at *12-13 (D. Del. Nov. 14, 2000). Though the convenience of the non-party witnesses is only an issue to the extent that the witnesses "may actually be unavailable for trial," Mentor Graphics Corp. v. Quickturn Design Sys., 77 F. Supp. 2d 505, 510 (D. Del. 1999), "it is sufficient for purposes of venue transfer analysis if the witness is not subject to a Court's subpoena power." Nilssen v. OSRAM Sylvania, Inc., 2001 U.S. Dist. LEXIS 25570, at *8 (D. Del. [*13] May 1, 2001); see also Anic v. DVI Fin Servs., 2004 U.S. Dist. LEXIS 11562, at *8 (D. Del. June 23, 2004). The Court has the power to subpoena a witness who can be served within this district, or at a place within 100 miles of the courthouse. Fed. R. Civ. P. 45(b)(2).

Most of the witnesses whose convenience Defendant claims strongly favors transfer are located in AT&T's Florham Park, New Jersey facility or in Berkeley Heights, New Jersey. (D.I. 11 at 18-20.) However, Defendant admits that both of these locations are within 100 miles of Wilmington, Delaware using a straight-line measurement. (Id. at 19.) Defendant argues that their presence still militates in favor of transfer because using an "ordinary and usual travel route" measurement puts them outside of the Court's subpoena power while they would be within the subpoena power of the transferee court by any measure. (Id.) Thus, transferring would "avoid later disputes." (Id. at 21.) There is, however, no genuine dispute that Delaware courts apply the modern approach, which measures "distance by a straight line on a map," as this method is the better construction of Rule 45 and is easier to apply [*14] in practice. Hill v. Equitable Bank, Nat'l Ass'n, 115 F.R.D. 184, 186 (D. Del. 1987). By contrast, the cases cited by Defendant in favor of the "ordinary and usual travel route" approach are more than 50 years old and are from district courts outside of Delaware. (D.I. 11 at 20.) Thus, the Court concludes that these witnesses are within the subpoena power of the Court and considered available to testify for the purposes of venue transfer.

Defendant also asserts that two of the attorneys involved in prosecuting the Patents-in-Suit are outside the subpoena power of this Court, but within the subpoena power of the New York court, weighing heavily in favor of transfer. Defendant claims that these witnesses would testify to issues of claim construction and the validity and enforceability of the Patents-in-Suit.

In response, Plaintiffs argue that Defendant has not shown with sufficient specificity why the witnesses' testimony would be necessary, and that Defendant has not shown that either would be reluctant to travel to Delaware in order to testify. As to the first argument, the Court concludes that Defendant may have its reasons for calling the prosecuting attorneys, [*15] given the attorneys' first-hand involvement in prosecuting the patents and their knowledge thereof. (See D.I. 13, Ex. 17 and 18.) As to the second, Defendant bears no burden to show that the witnesses it plans to subpoena would be "reluctant" to testify. "It is sufficient... [that] the witness is not subject to a Court's subpoena power." Nilssen, 2001 U.S. Dist. LEXIS 25570, at *8. Thus, the Court concludes that the convenience of the prosecuting attorneys is a factor weighing in favor of transfer.

D. Convenience of the Parties

Defendant argues that because Plaintiffs' principal place of business is mere blocks away from the District Court for the Southern District of New York, the convenience of the parties weighs in favor of transfer. However, "a plaintiff's choice of forum is a paramount consideration not to be lightly disturbed." Mentor Graphics, 77 F. Supp. 2d. at 509. Furthermore, while the plaintiff's choice of forum is generally given less deference where the plaintiff has not chosen its home turf, a defendant's incorporation in the chosen forum is "a rational and legitimate reason for choosing the forum" that cannot be disregarded. [*16] Stratos, 2002 U.S. Dist. LEXIS 5653, at *6-7. Having incorporated in the forum state, the defendant "should not now complain that another corporation has chosen to sue it here." 2002 U.S. Dist. LEXIS 5653 at *7.

Defendant in this case is incorporated in Delaware and admits that "neither Delaware nor the Southern District of New York is significantly more convenient than the other" for itself. (D.I. 11 at 24.) Thus, the convenience of Defendant is not a factor weighing in either direction. As for the convenience of Plaintiffs, they have chosen the forum of Defendant's incorporation - a "rational and legitimate" choice that is entitled to deference. Stratos, 2002 U.S. Dist. LEXIS 5653, at *7. The Court concludes that the convenience of the parties does not weigh in favor of transfer.

E. Local Interest in the Controversy

Finally, Defendant argues that because Zoetics is in bankruptcy in the Southern District of New York, the local interest in the controversy weighs in favor of trans-

fer. However, as discussed supra, the bankruptcy proceeding and the patent infringement suit are neither identical nor parallel controversies. Further, as Defendant acknowledges, "[p]atent [*17] rights are not local or state matters and therefore cannot give rise to a local controversy, or implicate local public policy." Stratos, 2002 U.S. Dist. LEXIS 5653 at *8; see also Trilegiant Loyalty Solutions, Inc. v. Maritz, Inc., 2005 U.S. Dist. LEXIS 2825, at *8 (D. Del. Feb. 15, 2005). Therefore, the Court concludes that the Southern District of New York does not have a local interest in the controversy.

F. Conclusion

Although "[c]onvenience of the expected trial witnesses is the most important factor to consider when determining whether or not transfer is appropriate," Memminger, 2000 U.S. Dist. LEXIS 22077 at *12-13, the Court concludes that the potential unavailability of the attorneys who prosecuted the patent - the sole factor weighing in favor of transfer - is insufficient to overcome the "paramount" consideration of Plaintiffs' choice of forum. *Mentor Graphics, 77 F. Supp. 2d. at 509*. Plaintiffs had a legitimate reason for choosing to sue in Delaware, and Defendant has not carried its burden of negating that choice. Accordingly, the Court will deny Defendant's Motion to Transfer Action to the District [*18] Court for the Southern District of New York.

# EXHIBIT F

8 of 100 DOCUMENTS

**PEGASUS DEVELOPMENT CORPORATION and PERSONALIZED MEDIA COMMUNICATIONS, L.L.C., Plaintiffs v. DIRECTV, INC., HUGHES ELECTRONICS CORPORATION, THOMPSON CONSUMER ELECTRONICS, INC., and PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, Defendants. AND RELATED COUNTERCLAIMS**

**Civil Action No. 00-1020-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 8052*

**May 14, 2003, Decided**

**SUBSEQUENT HISTORY:** As Amended September 4, 2003.

**PRIOR HISTORY:** *Pegasus Dev. Corp. v. Directv, Inc., 2002 U.S. Dist. LEXIS 6825 (D. Del., Apr. 18, 2002)*

**DISPOSITION:** [*1] Defendants' motion to stay pending patent reexamination granted. Plaintiffs' motion for leave to assert claim patent denied. Motions to dismiss denied.

**COUNSEL:** For Pegasus Development Corporation, Personalized Media Communications LLC, PLAINTIFFS: Rudolf E Hutz, Rudolf E Hutz, Connolly, Bove, Lodge & Hutz, Wilmington, DE USA.

For Directv Inc, Hughes Electronics Corporation, Thomson Consumer Electronics Inc, Thomson Multimedia, Inc, DEFENDANTS: Donald F Parsons, Jr, Mona A Lee, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Thomson Consumer Electronics Inc, DEFENDANT: Karen Jacobs Louden, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Philips Electronics North America Corporation, DEFENDANT: Steven J Balick, Steven T Margolin, Ashby & Geddes, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory Moneta Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION** [*2]

On December 4, 2000, Pegasus Development Corporation ("Pegasus") and Personalized Media Communications, L.L.C. ("PMC") filed a complaint against several defendants, alleging infringement of six patents, including *U.S. Patent Nos. 4,965,825* ("the '825 patent") and 5,335,277 ("the '277 patent"). Since that time, the original scheduling order has been revised several times. Currently, fact discovery is scheduled to close on August 22, 2003, and a trial is scheduled for February of 2004.

On February 4, 2003 and March 14, 2003, respectively, the defendant Thomson Consumer Electronics, Inc. ("Thomson") filed with the Patent and Trademark Office ("PTO") a request for *ex parte* reexaminations of the '825 and '277 patents. The request for reexamination of the *'825 patent* was granted on April 10, 2003. n1 Presently before the court is a joint motion by the defendants to stay the litigation pending the completion of the patent reexaminations (D.I. 459). After careful consideration of the parties' submissions, and for the reasons detailed below, the court will grant the motion.

---

n1 The court is not yet aware of a decision by the PTO regarding reexamination of the '277 patent.

---

[*3]

**II. DISCUSSION**

The decision to stay a case is firmly within the discretion of the court. *Cost Bros., Inc. v. Travelers Indem. Co., 760 F.2d 58, 60 (3d Cir. 1985)*. This authority applies equally to patent cases in which a reexamination by the PTO has been requested. *Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988)* ("Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citation omitted); *see also Emhart Indus. v. Sankyo Seiki Mfg., 1987 U.S. Dist. LEXIS 15033, 3 U.S.P.Q. 2d 1889, 1890 (N.D. Ill. 1987)* ("In passing the legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion."); *Gould v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir. 1983)* (citing legislative history of reexamination statute). In determining whether a stay is appropriate, the court is guided by the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving [*4] party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp v. 3Comm Corp., 69 F. Supp.2d 404, 406 (W.D.N.Y. 1999)* (citing cases); *cf. United Sweetner USA, Inc. v. Nutrasweet Co., 766 F. Supp. 212, 217 (D. Del. 1991)* (stating a similar test).

In this case, there are two plaintiffs, four defendants, and several counter claimants, as well as six patents comprising dozens of claims. In addition, the written submissions in this case have been particularly voluminous; the briefing on claim construction alone, for example, constitutes 576 pages. *See Report and Recommendation of Special Master Regarding Claim Construction at 2 (citing "copious briefing").* In these ways, the present suit is quite complex, although, perhaps, not extraordinarily so. The greater context of this suit is extraordinary, however: the plaintiffs have filed more than 300 related patent applications based upon an original patent application filed in 1981 and supplemented in 1987. Together, these applications contain an estimated 10,000 claims. Furthermore, as observed [*5] by the Special Master appointed in this case, the 1987 application alone constitutes over 300 columns of patent text and "is, by any measure, an extremely complex document." *Id.* at 2. These related applications may become relevant to the present case in respect to several issues including claim construction, enablement, adequacy of written description, indefiniteness, and inequitable conduct. *See id.* at 21. Thus, in this case, more than many, the court would benefit from a narrowing of the issues.

The reexamination process will serve this purpose. For example, the court will gain the benefit of the PTO's particular expertise, in that all prior art presented to the court will have been first considered by that agency. *See Braintree Laboratories, Inc. v. Nephron-Tech, Inc., 1997 U.S. Dist. LEXIS 2372, 1997 WL 94237, at *9 (D. Kan. 1997)*; *Hamilton Indus., Inc. v. Midwest Folding Products Mfg., 1990 U.S. Dist. LEXIS 3138, 1990 WL 37642, at *1-2 (N.D. Ill. 1990)*. Other potential efficiencies resulting from the reexamination process are numerous: (1) many discovery problems relating to the prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial, reducing the [*6] complexity and length of the litigation; (3) the issues, defenses, and evidence will be more easily limited in pretrial conferences following a reexamination; (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court; and (5) if the patent is declared invalid, the suit likely will be dismissed as to that patent. *Id.* These efficiencies will result in a reduced cost of litigation for the parties and more effective utilization of the limited resources of the court. *Id.*

Thus, a stay may result in a simplification or reduction of issues for the court's consideration, or it may dispense with the litigation entirely. These are considerable economies indeed, particularly in this case. Given the involved prosecution history of the various patents-in-suit and hundreds of related patents, the number of claim terms at issue, the inordinate amount of prior art references, and the PTO's conclusion that all of the challenged claims warrant reexamination, the court finds particular merit in permitting an additional layer of review by the PTO before expending further judicial resources. *See Digital Magnetic Systems, Inc. v. Ainsley,* [*7] *213 U.S.P.Q.290,290 (W.D.Okla. 1982)* ("Congress enacted the reexamination procedure to provide an inexpensive, expedient means of determining patent validity which, if available and practical, should be deferred to by the courts."); *Softview Computer Products Corp. v. Haworth, Inc., 2000 U.S. Dist. LEXIS 4254, 2000 WL 1134471, at *3 (S.D.N.Y. 2000)* ("The grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims."). Furthermore, the court notes that discovery is not complete, and the trial, although scheduled, is some nine months in the future. In light of all these factors, and considering that the reexamination process will proceed "with special dispatch," *35 U.S.C. 305,* the court concludes that a stay is the most compelling alternative.

The court recognizes that a stay will cause further delay in a case that has suffered several delays already, as well as considerable distress to the plaintiffs. The court is sensitive to the plaintiffs' right to have their day in court. Nonetheless, for the reasons already mentioned, the court is convinced that a stay is appropriate in this particular case. In addition, [*8] the court reminds the

plaintiffs that they affirmatively invoked the rights of the patent statute; they can hardly be heard now to complain of the rights afforded others by that same statutory framework. Thomson is legally entitled to invoke the reexamination mechanism, and the PTO has determined that reexamination is warranted. There is nothing facially untoward in that. Moreover, the court notes that if, after reexamination, the plaintiffs' patents are again upheld, the plaintiffs' rights will only be strengthened, as the challenger's burden of proof becomes more difficult to sustain. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc., 807 F.2d 955, 961 (Fed. Cir. 1986)* (holding that upon reissue, the burden of proving invalidity is 'made heavier') (quoting *Interconnect Planning Corp. v. Feil, 774 F.2d 1132, 1139 (Fed. Cir. 1985))*. In this light, and given the particular circumstances of this case, the court cannot find that the prejudice to the plaintiffs is undue.

Objecting to a stay, the plaintiffs also have complained of dilatory conduct by the defendants, who, in turn, have accused the plaintiffs of "burying" the PTO in claims and prior [*9] art references. *See, e.g.,* Mem. of Plaintiffs in Opp. to Defs.' Joint Motion to Stay (D.I. 488) at 5-22 (detailing ways in which the defendants allegedly "have repeatedly acted to complicate and delay the resolution of this litigation"); Defs.' Joint Brief in Support of Motion to Stay (D.I. 460) at 4 ("Many of the Harvey patents had vast numbers of cited prior art references of record, effectively burying the most relevant ones.") and 7 ("It appears that PMC sought to 'overwhelm' the PTO and the Courts.").

As a brief response to the accusation of dilatory conduct, the court notes that Thomson's request for reexamination of the *'825 patent* comprised 2,610 pages; its request regarding the *'277 patent* totaled 4,736 pages. It is presumed that such an effort requires an enormous expenditure of time and other resources; thus, the timing of Thomson's reexamination requests does not, necessarily, reflect undue delay. Furthermore, as noted above, Thomson was legally entitled to invoke the reexamination procedure when it did. As to the defendants' repeated complaint that the plaintiffs overwhelmed the PTO with prior art references during prosecution of the patents-in-suit, the implications [*10] of such alleged conduct will be explored at another time in the litigation, if necessary. At this stage in the process, the court is satisfied that the PTO has found "substantial new questions of patentability" raised by each of the cited references, and has determined that all of the challenged claims of the *'825 patent* necessitate a reexamination. *See* PTO's Decision Granting Reexamination, Supp. Appendix to

Defs.' Joint Brief in Support of Motion to Stay (D.I. 467) at 138. Although the court regrets a further delay in the present case, it is confident that the advantages of a stay outweigh the costs.

**III. CONCLUSION**

Because the PTO's reexamination of one or more of the patents-in-suit may materially affect the issues in this case, the court will grant the defendants' motion to stay. The case is stayed pending a disposition of the PTO's reexamination of patent '825, and will be stayed pending reexamination of the '277 patent, if applicable. All pending motions will be denied without prejudice; the parties may refile them following the stay and upon the entry of a new scheduling order, if applicable.

Thus, for the aforementioned reasons, IT IS HEREBY ORDERED that: [*11]

> 1. The defendants' Motion to Stay Pending Reexamination by the U.S. Patent and Trademark Office (D.I. 459) is GRANTED. The proceedings are stayed from the date of this order until further notice.
>
> 2. The parties shall advise the court of any decision that results from the PTO's reexamination of the *'825 patent*, and any other decision of the PTO regarding reexamination of any of the other patents-in-suit.
>
> 3. The plaintiffs' Motion for Leave to Assert Claim 15 of U.S. Patent 4,965,825 (D.I. 399) is DENIED without prejudice.
>
> 4. Thomson's Motion to Dismiss or in the Alternative for Summary Judgment (D.I. 376) is DENIED without prejudice.
>
> 5. Phillips' Motion to Dismiss for Lack of Standing (D.I. 396) is DENIED without prejudice.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Date: May 14, 2003

# EXHIBIT G

1 of 100 DOCUMENTS

**STRATOS LIGHTWAVE, INC., Plaintiff/Counterclaim Defendant, v. E2O COMMUNICATIONS, INC., Defendant/Counterclaim Plaintiff.**

**Civil Action No. 01-309-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 5653*

**March 26, 2002, Decided
March 26, 2002, Filed**

**DISPOSITION:** [*1] Motion to transfer venue to Central District Of California denied.

**COUNSEL:** Attorneys for the plaintiff, Stratos Lightwave, Inc.: Joseph N. Hosteny, III, Arthur A. Gasey, Paul C. Gibbons, Niro, Scavone, Haller & Niro, Chicago, Illinois. Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

Attorneys for the defendant, E2O Communications, Inc.: David P. Enziminger, Brett J. Williamson, David E. Lederman, O'Melveny & Meyers LLP, Los Angeles, California. William J. Wade, Richards, Layton & Finger, Wilmington, Delaware.

**JUDGES:** Joseph J. Farnan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Joseph J. Farnan

**OPINION:**

### MEMORANDUM ORDER

Presently before the court is a Motion To Transfer Venue To The Central District of California (D.I. 11) filed by Defendant E2O Communications, Inc. ("E2O"). For the reasons discussed, the motion will be denied.

### BACKGROUND

Stratos Lightwave, Inc. ("Stratos") and E2O both manufacture and sell optoelectronic transciever modules which are used in computer networks. (D.I. 8 at 1). Stratos is a Delaware corporation with its headquarters in Chicago, Illinois and facilities in California. (D.I. 17 at 1). E2O is also incorporated [*2] in Delaware, but maintains its headquarters in Calabasas, California. (D.I. 8 at 2). The design and development of E2O's accused products is conducted in California, where the majority of E2O's domestic employees are located. (D.I. 8 at 2). The accused products are manufactured internationally, in Asia. (D.I. 8 at 2).

On May 5, 2001, Stratos filed this action against E2O alleging infringement of U.S. Patent Nos. 5,717,533, 5,734,558, 5,864,468, 5,879,173, Re. 36,820, 6,201,704B1, and 6,320,878BI. (D.I. 1). E2O subsequently filed the instant motion to transfer.

### DISCUSSION

By its motion, E2O contends that Delaware is an inconvenient forum because its corporate offices, where all the relevant documents and knowledgeable fact witnesses are located, are in California. (D.I. 8 at 7). E2O contends that litigation in Delaware would be not only expensive, but disruptive to the corporation. (D.I. 8 at 7). E2O further contends that Delaware is an inconvenient forum for the witnesses, none of whom reside in Delaware, and further that several non-party witnesses exist who would be beyond the Court's subpoena power. (D.I. 8 at 8). Additionally, E2O contends that the Central District of [*3] California is more convenient because the median time to trial is faster. (D.I. 8 at 11). Finally, E2O contends that California, not Delaware, has a local interest in deciding this controversy because the majority of the allegedly infringing activity took place in California. (D.I. 8 at 11). n1

n1 E2O continuously argues that Stratos' contacts with Delaware are "de minimis, at best;" however, the Court finds this argument to be immaterial in the context of a motion to transfer.

In opposition, Stratos contends that its choice of forum is entitled to substantial deference. (D.I. 17 at 4). Stratos contends that although Delaware is not its home turf, it chose to sue E2O in Delaware because E2O is

incorporated in this state. (D.I. 17 at 5). Stratos further contends that E2O, a successful international company, is capable of financing litigation in Delaware, and transferring this action to California would merely shift the burden of expense to Stratos. (D.I. 17 at 7). By E2O's failure to identify non-party witnesses [*4] beyond subpoena power, Stratos contends that the convenience of the witnesses does not weigh in favor of transfer. (D.I. 17 at 11-10). Stratos further contends that adjudication of this action, pursuant to the Court's Scheduling Order (D.I. 15), will be faster than in California, where a new scheduling order would be put in place. (D.I. 17 at 12).

Transfer of a civil action is governed by *28 U.S.C. § 1404*(a) which provides, "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The purpose of § 1404(a) is "to prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack, 376 U.S. 612, 616, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964)* (internal citations omitted). Because it is undisputed that Stratos could have brought the instant action in the Central District of California, the Court's only task is to determine whether the factors enumerated in § 1404(a) and by the United States Court of Appeals for the Third [*5] Circuit, warrant a transfer.

The Third Circuit has instructed that when reviewing a motion to transfer under *28 U.S.C. § 1404*(a) district courts must consider, among other things, private n2 and public n3 interests. See *Jumara v. State Farm Ins. Co., 55 F.3d 873 (3d Cir. 1995)*. When determining whether or not transfer is warranted in the circumstances presented, district courts must balance all of the relevant factors and respect that a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed. *Id. at 883;* see also *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1920).* The burden is upon the movant to establish that the balance of the interests strongly weighs in favor of transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. See *Continental Cas. Co. v. American Home Assurance Co., 61 F. Supp. 2d 128, 131 (D. Del. 1999).*

n2 The private interests are:

(1) the plaintiff's choice of forum, (2) the defendant's preferred forum, (3) whether the claim arose elsewhere, (4) the convenience of the parties due to their relative physical and financial conditions, (5) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (5) the location of books and records, to the extent that these books and records could not be produced in a certain forum.

*Jumara v. State Farm Ins. Co., 55 F.3d 873, 883 (3d Cir. 1995).*

[*6]

n3 The public interests are:

(1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases.

Id.

## I. Private Interests

After a consideration of the relevant private interests, the Court concludes that the balance of these factors does not weigh strongly in favor of transfer. As stated previously, a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed. *Shutte, 431 F.2d at 25.* In the instant case, stratos' preference for Delaware is not given as much deference because it, admittedly, has not chosen its home turf. See *Continental, 61 F. Supp. 2d at 131* (stating that "the transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen [*7] its home turf or a forum where the alleged wrongful activity occurred"). However, it is not appropriate to disregard a plaintiff's choice of forum where it had a rational and legitimate reason for choosing the forum. See *Joint Stock Society v. Heublein, Inc., 936 F.Supp 177, 187 (D. Del. 1996).* And the fact that E2O has incorpo-

rated in Delaware is a rational and legitimate reason for choosing to sue E2O in Delaware. In fact, E2O, having received the benefits of Delaware incorporation, should not now complain that another corporation has chosen to sue it here. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 821 F. Supp. 962, 965 (D. Del. 1993).* Therefore, Stratos' forum preference, as well as E2O's Delaware incorporation, weigh in favor of maintaining this action in Delaware.

The Court cannot conclude that the balance of the remaining factors strongly weigh in favor of transfer. No witness, reluctant to testify, beyond the subpoena power of the Court, has been identified. The relevant documents, books, and records can be easily transported to Delaware. The financial burden on Defendants to litigate in Delaware is not unduly harsh. In sum, [*8] the private interests weigh in favor of maintaining this action in Delaware.

**II. Public Interests**

In the Court's view, none of the public interests weigh in favor of transfer. Patent rights are not local or state matters and therefore cannot give rise to a local controversy, or implicate local public policy. Similarly, because this is a patent infringement action, the familiarity of the trial judge with the application of state law is not applicable. Further, in light of the Scheduling Order already in place, the Court is not persuaded that this case would be adjudicated faster in the Central District of California. Finally, as discussed above, the Court concludes that Delaware is not an unduly inconvenient forum for E2O to litigate this action in. Accordingly, the motion to transfer will be denied. n4

n4 The Court is aware of *Methode Electronics & Stratos Lightwave, Inc. v. Finisar, 205 F.R.D. 552 (N.D.Ca. 2001)* (the "Methode Case"), and its resolution. It is the Court's view that the Methode Case is irrelevant to the instant case, and the presence or absence of that action is not material to the Court's decision to retain jurisdiction over the instant case.

[*9]

NOW THEREFORE IT IS HEREBY ORDERED this 26 day of March 2002 that E2O's Motion To Transfer Venue To The Central District Of California (D.I. 11) is **DENIED**.

Joseph J. Farnan

UNITED STATES DISTRICT JUDGE

# EXHIBIT H

2 of 100 DOCUMENTS

**CASHEDGE, INC., Plaintiff, v. YODLEE, INC., Defendant.**

**Civil Action No. 06-170-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 50488*

**July 19, 2006, Decided**

**COUNSEL:** [*1] Arthur G. Connolly, III, Esquire, of CONNOLLY BOVE LODGE & HUTZ LLP, Wilmington, Delaware, Of Counsel: Drew M. Wintringham, III, Esquire, and Mark W. Rueh, Esquire, of CLIFFORD CHANCE ROGERS & WELLS LLP, New York City, New York, Attorneys for Plaintiff.

William J. Marsden, Jr., Esquire, and Kyle Wagner Compton, Esquire, of FISH & RICHARDSON, P.C., Wilmington, Delaware, Of Counsel: David M. Barken, Esquire, and Craig R. Compton, Esquire, of FISH & RICHARDSON, P.C., Redwood City, California, Attorneys for Defendant.

**JUDGES:** Joseph J. Farnan, Jr., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Joseph J. Farnan, Jr.

**OPINION:**

### MEMORANDUM OPINION

**Farnan, District Judge.**

Pending before the Court is Defendant's Motion To Transfer (D.I. 12). For the reasons discussed, the Motion will be granted.

### I. BACKGROUND

Plaintiff was issued United States Patent No. 7,013,310 ("the '310 patent"), entitled "Method And Apparatus For Retrieving And Processing Data" on March 14, 2006. That same day, Plaintiff filed its Complaint in this Court, alleging infringement of the '310 patent. (D.I. 1). Defendant filed its Answer and Counterclaim on April 4, 2006, and stated its intent to file a motion [*2] to transfer. (D.I. 5). On May 4, 2006, Defendant filed its Motion to Transfer. (D.I. 12).

Defendant's Motion to Transfer is based on a pending action in the Northern District of California, Case

No. C-05-1550-SI. On April 14, 2005, Defendant filed a patent infringement action in the Northern District of California, alleging that Plaintiff infringed several of its U.S. Patents. In response, Plaintiff filed an action in the same court, seeking a declaratory judgment of non-infringement, invalidity, and unenforceability of the patents asserted in Defendant's case and additional patents. Those two actions were consolidated into one nine-patent case ("the California action"). The California court conducted a Markman hearing on April 26, 2006.

### II. PARTIES' CONTENTIONS

By its Motion, Defendant contends that, pursuant to 28 U.S.C. § 1404(a), the Court should transfer this action to the Northern District of California. In support of this contention, Defendant argues that Plaintiff's allegations of infringement of the '310 patent are related to the allegations in the California action. Further, Defendant contends that certain patents in the California action [*3] are prior art to Plaintiff's '310 patent and form the basis of Defendant's inequitable conduct defense. n1 In response, Plaintiff contends that the Court should deny the Motion because Plaintiff chose Delaware, the California action is unrelated, and judicial economy would not be served by transfer.

n1 Defendant alleges that, at a minimum, United States Patent Nos. 6,317,783 ("the '783 patent"), 6,199,077 ("the '077 patent"), and 6,412,073 ("the '073 patent") are material prior art to Plaintiff's '310 patent. (D.I. 5 at P 23).

### III. DISCUSSION

Under 28 U.S.C. § 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other

district or division where it might have been brought." 28 U.S.C. § 1404(a). Since it is undisputed that Plaintiff could have brought the instant action in the Northern District of California, the Court's only task is to determine whether the factors [*4] enumerated in Section 1404(a) warrant a transfer under the circumstances.

The Third Circuit has set forth a list of factors for district courts to consider when deciding whether or not to transfer venue. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879-80 (3d Cir. 1995). These factors include six private interests: (1) the plaintiff's forum preference as evidenced by his or her original choice, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties due to their relative physical and financial condition, (5) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (6) the location of books and records, to the extent that the books and records could not be produced in a certain forum. Id. at 879. The factors also include six public interests for courts to consider: (1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home [*5] forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases. Id. at 879-80. District courts must balance all of the relevant factors and determine whether a transfer of venue would best serve all the aforementioned interests. Id. at 883. The burden is on the movant to establish that the balance of the interests weighs in favor of the requested transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. Continental Cas. Co. v. Am. Home Assurance Co., 61 F. Supp. 2d 128, 131 (D. Del. 1999).

### A. PRIVATE INTERESTS

Although the plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed, Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1920), when the plaintiff lacks a rational and legitimate reason to litigate in the forum, the transfer of a case to a more appropriate forum is less inconvenient. Brunswick Corp. v. Precor Inc., 2000 U.S. Dist. LEXIS 22222, at *7 (D. Del. Dec. 12, 2000); See Waste Distillation Tech., Inc. v. Pan Am. Res., Inc., 775 F. Supp. 759, 764 (D. Del. 1991). [*6] A corporation's decision to incorporate in a particular state is a rational and legitimate reason to choose to litigate in that state. Stratos Lightwave, Inc. v. E2O Communs., Inc., 2002 U.S. Dist. LEXIS 5653, C.A. No. 01-309 JJF, at *7 (D. Del. March 26, 2002). Accordingly, the first factor weighs against transfer, and Defen-

dant must demonstrate that the other Jumara factors strongly favor a transfer to California.

The Court concludes that the other private interest factors weigh in favor of transfer. Here, both parties are Delaware corporations with principal places of business outside Delaware. Plaintiff is headquartered in New York City, and Defendant is headquartered in Redwood City, California. Both parties maintain offices in the Northern District of California. Also, there are likely witnesses, such as former employees, that still reside in the Northern District of California. The location of books and records is neutral as neither party has argued that it would be unable to produce documents in either forum.

Importantly, the same parties are currently litigating in the Northern District of California. Although the Court understands that the California [*7] action and this action are different, n2 the technologies at issue all relate to data extraction, retrieval, or presentation through Internet technologies, such as web sites and web pages. The Northern District of California is more convenient for the parties because the parties and potential witnesses are located in that district, the parties have proven capable to litigate there, and the court is already familiar with the parties and their technologies.

> n2 This action requires claim construction of the claim language of the '310 patent, which is not part of the California action. However, Defendant's patents-in-suit in the California action are relevant to its defenses and counterclaim in this action.

### B. PUBLIC INTERESTS

The Court also concludes that the public interest factors weigh in favor of transfer. Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court." Brunswick, 2000 U.S. Dist. LEXIS 22222, [*8] at *8. Factors supporting a decision to transfer include whether the litigation in the target forum involves: (1) the same parties, (2) related or similar technologies for the judge to become familiar with, and (3) a common field of prior art.

In this case, judicial efficiency regarding the ease, speed, or expense of trial strongly weigh in favor of transfer. The California action involves the same parties, similar technologies, and related patents-in-suit. The parties in the California action have already conducted a two-hour technology tutorial on April 19, 2006, argued Markman issues in nine patents on April 26, 2006, and commenced discovery on seemingly related products and technologies. Additionally, the Court concludes that pub-

Case 1:06-cv-00407-JJF    Document 11-3    Filed 08/10/2006    Page 27 of 31

Page 3
2006 U.S. Dist. LEXIS 50488, *

lic interests such as enforceability of the judgment, familiarity with state law in diversity actions, local interests in deciding local controversies, and court congestion are neutral or non-applicable factors in this case. Jumara, 55 F.3d at 879-880. Accordingly, the interests of judicial efficiency and justice are best served by transferring this case to the Northern District of California.

## IV. CONCLUSION

In sum, for the [*9] reasons discussed, the Court concludes that the balance of the private and public interest factors support transferring this case to the Northern District of California where related litigation is pending. Accordingly, the Court will grant Defendant's Motion To Transfer (D.I. 12).

An appropriate Order will be entered.

ORDER

At Wilmington, the 19 day of July 2006, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that the Defendant's Motion To Transfer (D.I. 12) is **GRANTED.**

Joseph J. Farnan, Jr.

UNITED STATES DISTRICT JUDGE

# EXHIBIT I

**BRUNSWICK CORPORATION, Plaintiff, v. PRECOR INCORPORATED., Defendant.**

**C.A. No. 00-691-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2000 U.S. Dist. LEXIS 22222*

**December 12, 2000, Decided**
**December 12, 2000, Filed**

**DISPOSITION:** [*1] Precor's motion to transfer granted.

**COUNSEL:** For BRUNSWICK CORPORATION, plaintiff: Robert W. Whetzel, Richards, Layton & Finger, Wilmington, DE.

For PRECOR INCORPORATED, defendant: Samuel David Brickley, II, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

On August 1, 2000, the plaintiff, Brunswick Corporation, and its division Life Fitness ("Life Fitness") brought this patent infringement action against Precor Incorporated ("Precor"). Life Fitness alleges that Precor is infringing its U.S. Patent No. *6,095,951* (" *'951* patent") relating to exercise treadmills. Presently before this court is Precor's motion to transfer this case to the United States District Court for the Western District of Washington, pursuant to *28 U.S.C. § 1404*(a). Because the court finds that a transfer would convenience the parties and the witnesses while serving the interests of justice, Precor's motion to transfer is granted.

### I. BACKGROUND

#### A. The parties

Life Fitness and Precor both design, manufacture, [*2] and sell exercise equipment and both directly compete with one another in the exercise fitness market. Although both parties are incorporated in Delaware, neither party maintains a physical presence (e.g., offices or facilities) in this state. Life Fitness has its principal place of business in Franklin Park, Illinois and Precor has its principal place of business in Bothell, Washington.

#### B. Prior Litigation Between the Parties

"Life Fitness and Precor are no strangers to each other, nor to patent litigation." D.I. 7, at 2. In 1994, Precor filed a patent infringement suit against Life Fitness in the United States District Court for the Western District of Washington ("1994 litigation"). At issue in the 1994 litigation were . U.S. Patent Nos *5,599,259, 5,752,897* and certain Claims of U.S. Patent No. *5,382,207* (respectively the " *'259, '897,* and *'207* patents"). The *'207* patent is the parent of the *'951* patent currently at issue in the case before the court.

In the 1994 litigation, Claims 1-36 of *'207* patent were dismissed on summary judgment in February 1996 leaving only claims 37, 38, and 39 at issue. In early September 1999, Life Fitness voluntarily stipulated to the dismissal [*3] of the claims for infringement of the *'259* and *'897* patents as well as Claims 38-39 of the *'207* patent. As a result of this stipulation, these claims were dismissed with prejudice in an order dated September 23, 1999. *See Precor Inc. v. Life Fitness,* No. C94-1586C (W.D. Wash. Sept. 23, 1999) (stipulation and order of dismissal). Thus, the only infringement claim remaining for trial related to Claim 37 of the *'207* patent. In October 1999, Life Fitness lost at trial as to this one patent claim. The judgment from the 1994 litigation is currently on appeal to the Federal Circuit.

### II. DISCUSSION

Pursuant to *28 U.S.C. § 1404*(a), the court may transfer this action to "any other district where it might

2000 U.S. Dist. LEXIS 22222, *

have been brought" when it appears that a change of venue would "convenience" the parties and the witnesses while serving the "interest of justice." *28 U.S.C. § 1404*(a) (1993). The parties here agree that Life Fitness could have brought this action in the Western District of Washington. *See 28 U.S.C. S 1391*(b)(1) (1993). Moreover, this lawsuit could have initially been filed in Washington because it is a patent [*4] infringement matter. *See 28 U.S.C. § 1400*(b). Therefore, the court will next apply the most relevant public and private factors to the facts of the case as directed by the Third Circuit's decision in *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.1995).*

In *Jumara*, the Third Circuit Court of Appeals identified a nonexclusive list of factors that have been used to guide courts in the exercise of their discretion in ruling on requests for transfer. *55 F.3d at 879-80; see also Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp.2d 192, 196-97 (D. Del. 1998).* These factors fall into two groups: those relating to the private convenience of the litigants and those affecting the public interest in the fair and efficient administration of justice. *Jumara, 55 F.3d at 879-80.* n1 The court should apply these factors to determine, "on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." *Id. at 883* (citing *Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 30-31, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988)).* [*5] The burden is on moving party to show that balance of convenience and the interests of justice weighs in favor of transfer. *See Jumara, at 879.*

n1 The private interests may include: 1) the plaintiff's original forum preference; 2) the defendant's preference; 3) whether the claim arose elsewhere; 4) the convenience of the parties; 5) the convenience of the witnesses-- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and 6) the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). *Jumara, 55 F.3d at 879-880.* The public interests may include: 1) the enforceability of the judgment; 2) practical considerations that make the trial easy, expeditious, or inexpensive; 3) the relative administrative difficulty in the two fora resulting from court congestion; 4) the local interest in deciding local controversies at home; 5) the public policies of the fora; and 6) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.*

[*6]

A. Private Factors

The court concludes that the balance of the private factors tips slightly in favor of transfer. In this case, the court finds the convenience of the parties, the convenience of the witnesses, and the location of records and books to be the most pertinent of the private factors. Although both parties are incorporated in Delaware, Precor maintains its headquarters in the Western District of Washington and Life Fitness in Franklin Park, Illinois. Additionally, neither of the parties, their witnesses, or any of the potentially relevant documents and records are located in Delaware.

Recognizing that the balance of convenience tips toward the Western District of Washington, Precor further argues that Life Fitness will suffer no greater inconvenience in traveling to Washington than Delaware. In contrast, Life Fitness argues that its choice of forum is paramount. The court acknowledges that a plaintiff's choice of forum is a "paramount" consideration that is not to be "lightly disturbed." *Schutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970); see also Jumara v. State Farm Ins. Co., 55 F.3d 873, 879-80 (3d Cir. 1995).* In this case, [*7] however, the plaintiff's preference for Delaware is not given as much deference because most of the events at issue, that is, the design and manufacture of the exercise equipment, occurred outside of Delaware. *See Britamco Underwriters, Inc. v. Wallace, 56 F. Supp. 2d 542, 545 (E.D. Pa. 1999).* "The transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen . . . a forum where the alleged wrongful activity occurred." *Continental Casualty Co. v. American Home Assurance Co., 61 F. Supp. 2d 128, 131 (D. Del. 1999).* Thus, because the parties are located outside of Delaware, the witnesses as well as the relevant documents and records are located in Washington, and the product at issue was designed and manufactured in Washington, the Western District of Washington is a more convenient forum for the litigation.

B. Public Factors and the Interest of Justice

Although the private factors tip slightly in favor of the Western District of Washington, the relevant public factors weigh heavily in favor of transfer. Most relevant to the courts inquiry is whether there are practical considerations that would make [*8] trial "easy, expeditious, or inexpensive." *Jumara, 55 F.3d at 879.* In this case, there has already been litigation on the '207 patent, a parent patent of the one at issue here, in the Western District of Washington. This matter is on appeal. Moreover, the parties are currently litigating another patent infringement matter involving exercise equipment in the Western District of Washington. n2 Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court." *See Liggett Group, Inc. v. R.J. Reynolds To-*

*bacco Co., 102 F. Supp. 2d 518,* (D.N.J. 2000) (citations omitted). Thus, the court finds that transferring this case would promote the interests of justice.

n2 The parties disagree as to whether this is a directly related matter.

### III. CONCLUSION.

Finding that the balance of convenience and the interests of justice weigh in favor of transfer,

IT IS HEREBY ORDERED that:

1. Precor Incorporated's [*9] Motion to Transfer is GRANTED; and

2. This matter shall be TRANSFERRED to the Western District of Washington.

Date: December 12, 2000

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE